EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* DAISY RIVERA COLÓN, demandada y peticionaria.

*Número:* CE-89-6          *Resuelto:* 26 de junio de 1991

674

*Luis O. Rodríguez Rosario* y *Francisco M. Dolz Sánchez*, abogados de la peticionaria; *Norma Cotti Cruz, Procuradora General Interina,* y *Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso requiere que examinemos la validez constitucional de un allanamiento realizado en horas de la madrugada por la Policía de Puerto Rico en la residencia de la peticionaria, Daisy Rivera Colón, mientras se diligenciaba una orden de arresto contra una persona que se encontraba de visita. Ante nos la peticionaria invoca la protección constitucional contra registros irrazonables y cuestiona la decisión del Tribunal Superior que desestima una moción de supresión de la evidencia obtenida sin orden de allanamiento y que el Ministerio Público se propone utilizar en el procedimiento criminal que se sigue contra ella. Revocamos.

I

Según surge de la transcripción de evidencia y de los autos del caso, el día 26 de agosto de 1988, *entre las cuatro y cinco de la madrugada, se realizó un operativo policíaco* en el municipio de Fajardo, en el cual un sinnúmero de agentes del orden público

diligenciaron varias órdenes de arresto emitidas contra distintos ciudadanos. Entre estos se encontraba el Sr. Jaime Colón Vega, a quien se le imputaba infringir la Ley de Sustancias Controladas de Puerto Rico.

Con estos propósitos los agentes fueron a la residencia de Colón Vega y tocaron en la puerta. Un joven no identificado les abrió la puerta y la esposa de Colón Vega salió del interior de la residencia e informó que su esposo no se encontraba en el lugar. Sin corroborar esta información, los agentes le solicitaron a la señora Colón Vega que cuando él regresara a la casa le informara que tenían una orden de arresto contra él y que debía pasar por la División de Drogas. Inmediatamente después, se retiraron del lugar sin investigar si Colón Vega se estaba escondiendo de ellos. T.E., págs. 100–102.

Según el testimonio del agente Ortiz Robledo, los policías entonces se dirigieron a la residencia de la peticionaria Daisy Rivera Colón, donde en distintas ocasiones anteriores habían visto al sospechoso. T.E., págs. 19–20. Una vez allí, el agente pudo observar que una guagua roja y blanca, como la de Colón Vega, estaba estacionada frente a la casa de la peticionaria, localizada en una urbanización de Fajardo.[1] T.E., pág. 21.

La fotografía de la residencia, admitida en los procedimientos del foro de instancia, revela que la casa tenía una entrada pavimentada y un área de grama frente a unas ventanas de celosías. De la fotografía también se desprende que había un portal enrejado con un portón colocado frente a la puerta principal de la residencia. A varios pies de la entrada, y separadas por una pared que sobresalía de las rejas de forma perpendicular hacia la acera, había unas ventanas de celosía.

---

[1] Sobre la identificación del vehículo de motor, surgieron ciertas contradicciones en el contrainterrogatorio realizado por la defensa. El Agente Ortiz Robledo testificó que había visto a Colón Vega con la guagua roja y que había hablado con él sobre el precio de ésta en días anteriores. T.E., pág. 18. También testificó que en el área de Fajardo solamente había una guagua de ese tipo. T.E., pág. 50. Sin embargo, en el informe de delito y arresto, el agente no incluyó lo referente al vehículo. T.E., pág. 49. En la vista no pudo recordarse si la guagua tenía alguna particularidad que la pudiera identificar ni tampoco indicó si él o los agentes que lo acompañaban investigaron la identidad del dueño del vehículo a través de la tablilla. T.E., págs. 48–51.

Los agentes se detuvieron frente a la residencia (T.E., págs. 23–25) y rodearon la casa. Ortiz Robledo entró al solar de la peticionaria y, al ver que el portón de rejas estaba cerrado, caminó uno o dos pies y se dirigió hacia la única ventana que estaba entreabierta. T.E., pág. 31. Entonces, se paró sobre la grama que estaba frente a la ventana, sigilosamente se inclinó y atisbó entre las celosías. Como el interior estaba iluminado, vió a Colón Vega y a la peticionaria envasando un polvo blanco en una envoltura plástica. T.E., pág. 33.

Entonces, Ortiz Robledo le informó a Colón Vega de su presencia y le ordenó que abriera la puerta. Segundos después y ante la amenaza del agente con derrumbar la puerta, éste la abrió, así como el portón de rejas exterior. Inmediatamente los agentes procedieron a arrestar a Colón Vega y a la peticionaria,(2) y a hacerle las advertencias de rigor. El agente explicó que, después de arrestarlo en el portón exterior, Colón Vega solicitó autorización para buscar unos cigarrillos en una de las habitaciones y los policías lo acompañaron. Una vez en el interior, los policías observaron sobre la mesa del comedor sustancias controladas, parafernalia propia de esa actividad y un revólver. Simultáneamente, otros agentes se dirigieron al baño de la residencia y observaron envolturas plásticas en el interior del inodoro.(3)

Por la evidencia ocupada en su residencia, se presentaron contra la peticionaria varias acusaciones por violación a la Ley de Sustancias Controladas de Puerto Rico y a la Ley de Armas de Puerto Rico. Colón Vega también fue acusado por las mismas infracciones. Oportunamente, la peticionaria presentó una moción de supresión de evidencia en el proceso iniciado en su contra.

---

(2) De un minucioso examen de la transcripción de evidencia notamos que afloran otras contradicciones con respecto al arresto de la peticionaria. En la declaración jurada que prestó el agente Ortiz Robledo éste indicó que Daisy Rivera Colón fue arrestada junto a Colón Vega en la puerta de la residencia. Sin embargo, en la vista el agente testificó que la peticionaria fue arrestada por una mujer policía en una habitación de la residencia. T.E., págs. 68 y 84.

(3) Sobre este extremo también surgieron contradicciones, ya que en la declaración jurada el agente no dijo que había ido al baño ni que había visto las bolsas plásticas en el interior del inodoro.

Luego de considerar la prueba sometida en la vista, el tribunal de instancia declaró sin lugar la moción de supresión de evidencia. Entre otras cosas determinó que el arresto de Daisy Rivera Colón y el registro y allanamiento efectuado en su propiedad fue válido y razonable, ya que la orden de arresto emitida contra Jaime Colón Vega facultaba a los agentes del orden público a penetrar y registrar la propiedad de ésta.

De esa resolución recurre Daisy Rivera Colón argumentando que erró el tribunal de instancia al no suprimir la evidencia ocupada. Nos insta a que adoptemos la norma jurisprudencial de que para poder arrestar a un sospechoso en el hogar de una tercera persona es necesaria la expedición de una orden de allanamiento según lo resuelto por el Tribunal Supremo federal en *Steagald v. United States*, 451 U.S. 204 (1981). Por la importancia de la controversia, expedimos el auto de *certiorari* y ordenamos la paralización de los procedimientos.

La controversia presente en este recurso se circunscribe a determinar la legalidad del registro y allanamiento de la residencia de la peticionaria sin que mediara una orden de arresto o de allanamiento en su contra, ni la sospecha previa de que ésta cometiera algún delito o infracción. La premisa inicial es que el arresto de ella surge como consecuencia de la intervención por parte de los agentes del orden público con un sospechoso que se encontraba en su residencia y contra el cual pesaba una orden de arresto.

Para determinar si la actuación de los agentes fue válida, hay que examinar varias dimensiones del problema. En primer lugar, hay que determinar si los agentes del orden público infringieron la expectativa razonable de intimidad que gozaba la peticionaria, al traspasar la zona aledaña a su residencia y atisbar a través de una ventana. En segundo lugar, hay que examinar si al amparo de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, una orden de arresto contra un sospechoso convalida el allanamiento de la residencia de un tercero y si la evidencia obtenida en ese registro puede utilizarse en contra de este último.

## II

■ La protección constitucional contra registros y allanamientos irrazonables tiene fundamento tanto en la Constitución de Estados Unidos como en la de Puerto Rico. Sin embargo, aquí se aprobaron unas garantías más amplias que las que provee la Constitución federal y, por ende, nuestra Ley Fundamental goza de una vitalidad independiente. *Pueblo v. Dolce*, 105 D.P.R. 422 (1976). "Al interpretar el alcance de la protección este Tribunal ha reconocido expresamente su facultad de ampliar las garantías contra registros e incautaciones más allá de los límites de la Cuarta Enmienda." *Pueblo v. Malavé González*, 120 D.P.R. 470, 475 (1988).

■ Al interpretar sus contornos hemos hecho claro que en Puerto Rico esta garantía debe examinarse exclusivamente a la luz de la Sec. 10 del Art. II de nuestra Constitución, *supra. E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 205 (1984). Aunque las decisiones del Tribunal Supremo de Estados Unidos, que interpretan la Cuarta Enmienda, establecen el contenido mínimo de la protección constitucional, al descargar nuestra responsabilidad constitucional "podemos ir más allá de las fronteras limitativas de la jurisprudencia federal". *Pueblo v. Falú Martínez*, 116 D.P.R. 828, 837 (1986). Conforme a esta trayectoria jurisprudencial, resolvemos la controversia de autos al amparo de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra*. Por esta razón, las referencias en esta opinión a casos y materiales estadounidenses serán únicamente con fines comparativos. Cuando se examine una decisión del Tribunal Supremo federal relativa a la Cuarta Enmienda, se hará para indicar el contenido mínimo de esta garantía.

## III

La Sec. 10 del Art. II de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, ed. 1982, pág. 299, establece "el derecho del pueblo a la protección

de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables". La efectividad de este precepto constitucional se garantiza primordialmente por el requisito de que "[s]ólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse." Íd.

■ Estos preceptos constitucionales tienen como objetivo básico proteger la intimidad y la dignidad de los puertorriqueños. Véanse: *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988); *E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 207. Por tener apoyo en este derecho preeminente, hemos interpretado las garantías contra registros y allanamientos de forma más amplia que la jurisprudencia constitucional norteamericana. *Pueblo v. Dolce*, supra, págs. 428–429; *Pueblo v. Lebrón*, 108 D.P.R. 324, 327 (1979); *Pueblo v. Malavé González*, supra. No obstante, cuando consideramos que a la luz de nuestras realidades las normas formuladas por el Tribunal Supremo federal proveen protección a los puertorriqueños, las incorporamos al ordenamiento constitucional. *Pueblo v. Rivera Collazo*, 122 D.P.R. 408 (1988).

■ Nuestra jurisprudencia le ha impartido vitalidad a las garantías contra registros y allanamientos irrazonables con la presunción de invalidez que produce un registro efectuado sin una orden judicial previa. *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170, 175 (1986); *Pueblo v. Lebrón*, supra, pág. 329. Establecido que la incautación se realizó sin haberse obtenido el mandamiento judicial, compete al Ministerio Público rebatir la presunción de irrazonabilidad mediante la presentación de prueba sobre las circunstancias especiales que requirieron esa intervención. *Pueblo v. Malavé González*, supra.

■ De este modo, constitucionalmente es preferible el examen previo de un magistrado con criterio neutral e independiente antes de que se produzca la intervención. No obstante, los

registros realizados sin la orden de un magistrado no son siempre ilegales. Lo que la Constitución intenta evitar son los registros irrazonables. 3 Diario de Sesiones de la Convención Constituyente 1566 (1961). Cuando la incautación se haya efectuado sin una orden de un tribunal, el Estado siempre puede demostrar los hechos particulares del caso que justifiquen la intervención policial. Así, hemos definido estrechamente situaciones excepcionales en donde no es necesaria la orden. Ejemplos de éstas pueden verse en *Pueblo v. Zayas Fernández*, 120 D.P.R. 157 (1987) (registro incidental a un arresto válido); *Pueblo v. Dolce*, supra (doctrina del acto ilegal a plena vista); *Pueblo v. Lebrón*, supra, pág. 332 (evidencia abandonada en el "campo abierto"). Con estos principios de adjudicación constitucional en mente, examinemos las doctrinas aplicables al caso de autos.

## IV

█ La Cuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1, ed. 1982, pág. 186, dispone que "[n]o se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables . . .". Por muchos años, el criterio utilizado por el Tribunal Supremo federal para determinar si se efectuó un registro o allanamiento para propósitos de la Cuarta Enmienda fue examinar si ocurrió una intrusión gubernamental en un lugar constitucionalmente protegido. Véanse: *Silverman v. United States*, 365 U.S. 505 (1961); *Olmstead v. United States*, 277 U.S. 438 (1928); *Clinton v. Virginia*, 377 U.S. 158 (1964); *Goldman v. United States*, 316 U.S. 129 (1942); 1 *LaFave and Israel, Criminal Procedure* Sec. 3.2, pág. 162 (1984). Estas decisiones utilizaban nociones del derecho angloamericano de daños (entrada ilegal o *trespass*) para determinar cuándo se había realizado un allanamiento. Véase Comentario, *The Relationship Between Trespass and Fourth Amendment Protection After Katz v. United States*, 38 Ohio St. L.J. 709 (1977).

La decisión de *Katz v. United States*, 389 U.S. 347 (1967), cambió el enfoque analítico de la protección constitucional contra

registros y allanamientos y *adoptó el criterio de la expectativa razonable de intimidad.* Véanse: B.J. Serr, *Great Expectations of Privacy: A New Model for Fourth Amendment Protection,* 73 (Núm. 3) Minn. L. Rev. 583 (1989); R.G. Wilkins, *Defining the "Reasonable Expectation of Privacy": An Emerging Tripartite Analysis,* 40 Vand. L. Rev. 1077, 1088 (1987); W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, Sec. 2.1(b), pág. 307; *United States v. Fisch,* 474 F.2d 1071, 1076 (9no Cir. 1973).

A partir de esa decisión, se reconoció que la Cuarta Enmienda protege a las personas y no a los lugares, y que el alcance de su protección depende de si la persona tiene una expectativa legítima de intimidad en el lugar registrado y si ésta es razonable. *Smith v. Maryland,* 442 U.S. 735, 740–741 (1979). Esta segunda determinación debe hacerse tomando en cuenta la naturaleza de la intrusión gubernamental, su efecto sobre la expectativa de intimidad y la necesidad y utilidad del método investigativo utilizado para implantar la ley.

Al amparo de este enfoque se ha extendido la protección de la Cuarta Enmienda más allá del interior de la residencia para incluir también a la zona contigua a la casa, compuesta por el terreno y las estructuras accesorias. Esa zona es conocida como la "inmediación" o el *curtilage.*[4] *Oliver v. United States,* 466 U.S. 170, 180 (1984); *United States v. Dunn,* 480 U.S. 294, 301 (1987); *Wattenburg v. United States,* 388 F.2d 853 (9no Cir. 1968), citado en LaFave, *op. cit.,* Sec. 2.3(f), pág. 410. Sin embargo, esta protección no se extiende a las zonas que se encuentran fuera del *curtilage* o los que forman parte del campo abierto *(open field).* *Hester v. United States,* 265 U.S. 57 (1924), reafirmado en *Oliver v. United States,* supra.

---

(4) Esta palabra se deriva del latín *cohors* y del francés *cortillage,* posteriormente adoptada en inglés como *courtyard.* Véase *United States v. Romano,* 388 F. Supp. 101 esc. 4 (E.D. PA. 1975). Este término se utilizaba originalmente para describir las áreas de un edificio que eran susceptibles de ser escaladas *(common law burglary). Cf.* en Puerto Rico, *Pueblo v. Cosme Vargas,* 96 D.P.R. 836 (1969). Posteriormente se ha utilizado para analizar el alcance que la protección constitucional contra registros y allanamientos irrazonables le brinda a las casas y a los edificios.

■ No siempre es fácil determinar dónde termina la inmediación o *curtilage* y dónde comienza el campo abierto. En *United States v. Dunn, supra,* el Tribunal Supremo federal estableció cuatro factores para determinar la extensión del *curtilage*: (1) la proximidad a la casa de la zona que se alega compone el *curtilage* (si la zona está muy próxima a la casa o residencia, este hecho por sí solo hace mucho más probable que el área sea considerada como *curtilage*); (2) si el área se encuentra dentro de los linderos de la casa; (3) la naturaleza y el uso que se le da a esa zona, y (4) *las medidas que haya tomado el residente para proteger esta zona de observaciones que puedan hacer los transeúntes que por allí pasan.* Comentario, *Curtilage or open fields? Oliver v. United States gives renewed significance to the concept of Curtilage in Fourth Amendment Analysis,* 46 U. Pitt. L. Rev. 795 (1985).

■ Estos criterios le permiten a los tribunales evaluar si el lugar registrado se encuentra dentro de la inmediación o del *curtilage,* o si está fuera, en el campo abierto. Sin embargo, la determinación inicial de si la zona en cuestión está dentro o fuera del *curtilage* no resuelve el problema de si hubo o no un registro o allanamiento en violación de la cláusula constitucional. Para ello es necesario evaluar si la intervención policíaca viola la expectativa razonable de *intimidad de la persona;* no meramente si ha habido una entrada ilegal.

■ Para determinar si la zona está protegida deben considerarse los criterios siguientes:

1. El lugar registrado o allanado.

2. La naturaleza y grado de intrusión de la intervención policíaca.

3. El objetivo o propósito de la intervención.

4. Si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad.

5. La existencia de barreras físicas que restrinjan la entrada o la visibilidad al lugar registrado.

6. La cantidad de personas que tienen acceso legítimo al lugar registrado.

7. Las inhibiciones sociales relacionadas con el lugar registrado.

Véanse: Wilkins, *supra*, pág. 1078 esc. 3; J.A. Bush y R. Bly, *Expectation of Privacy Analysis and Warrantless Trash Reconnaissance After Katz v. United States*, 23 Ariz. L. Rev. 283, 288 esc. 6 (1981).

Ninguno de estos factores es determinante, y todos deben examinarse en conjunto. El análisis judicial para determinar si una entrada de los agentes constituye un registro irrazonable dependerá de si la persona tiene una expectativa razonable de intimidad en esa zona. O.E. Resumil, *Derecho Procesal Penal*, Orford, Equity Publishing Co., 1990, T. 1, Sec. 8.4, págs. 207–208.

█ Con estos criterios en mente, algunos tribunales estatales han resuelto que la Policía puede, en su función investigativa, entrar en áreas del *curtilage* que estén claramente visibles o implícitamente abiertas al público, y mientras lo hacen pueden utilizar sus sentidos sin ayuda de instrumentos. *State v. Corbett*, 516 P.2d 487 (Or. 1973); *State v. CREA*, 233 N.W.2d 736, 739 (Minn. 1975).

Por su parte, otras decisiones de tribunales estatales han utilizado estos criterios para determinar en qué circunstancias la intervención de la Policía en el *curtilage* de una residencia constituye un registro. Así por ejemplo, cuando un agente traspasa esa zona como parte de una gestión de vigilancia para observar a través de puertas y ventanas que no están claramente visibles, eso constituye un registro irrazonable. LaFave, *op.cit.*, Sec. 2.3(c), pág. 394. Véanse: *State of Texas v. González*, 388 F.2d 145 (5to Cir. 1968); *People v. Cogle*, 21 Cal. App.3d 57 (1971); *Olivera v. State*, 315 So. 2d 487 (Fla. App. 1975); *State v. Ragsdale*, 381 So. 2d 492 (La. 1980). El razonamiento de esa norma es que al limitar la visibilidad de su hogar, el residente tiene una razonable expectativa de intimidad en el interior de su casa y no espera que las personas o los agentes del orden público estén observando a través de las ventanas. Véase *Lorenzana v. Superior Court of Los Angeles County*, 511 P.2d 33 (Cal. 1973). Finalmente, como todo

análisis de razonabilidad, se tienen que examinar las circunstancias particulares de cada caso para de esa forma determinar el grado de intimidad que posee cada persona.

Por su valor persuasivo, adoptamos en Puerto Rico el enfoque analítico de *Katz v. United States*, supra, y los criterios de expectativa razonable de intimidad de *Smith v. Maryland*, supra, al evaluar la validez de un registro al amparo de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra.*

## V

En su recurso, la peticionaria sostiene que al atisbar a través de la ventana de su residencia en horas de la madrugada el agente Ortiz Robledo invadió la intimidad de su hogar e incurrió en un registro irrazonable vedado por la Constitución. Tiene razón.

■ En Puerto Rico hemos reconocido que la protección constitucional de la Sec. 10 del Art. II, *supra*, se extiende a la zona compuesta por el terreno y las estructuras accesorias que, junto a la casa, constituyen una unidad de vivienda. *Pueblo v. Álvarez Solares*, 95 D.P.R. 789, 795 (1968); *Pueblo v. Torres Resto*, 102 D.P.R. 532, 534 (1974). Sin embargo, como parte de su función investigativa, la Policía puede entrar en áreas del *curtilage* de una residencia que esté implícitamente abierto al público con el propósito de conversar con los ocupantes de la residencia o procurar a alguna persona. *Pueblo v. Torres Resto*, supra, pág. 534.

En el caso particular ante nos, los agentes primero fueron a la casa del sospechoso y, sin corroborar la información ofrecida por su esposa de que no se encontraba en la casa, le dejaron un mensaje de que era buscado con una orden de arresto. Asumieron que no se encontraba en su hogar y se dirigieron a la casa de un tercero donde en ocasiones anteriores el agente había visto al sospechoso.

Aunque no sabían quién residía en ese lugar y no tenían información sobre actividades delictivas cometidas en esa residen-

cia, los agentes fueron a la urbanización donde estaba localizada la casa. A las 4:30 de la madrugada, el grupo llegó a la urbanización y, al ver un vehículo parecido al de Colón Vega, los policías rodearon el lugar.

Desde la acera no se podía ver ninguna actividad en el hogar. El agente caminó hasta el portal de la entrada de la casa y al verlo cerrado se movió hasta la única ventana que estaba entreabierta para mirar hacia el interior del hogar. En vez de tocar la puerta principal, Ortiz Robledo caminó por la grama y, sigilosamente, atisbó por la ventana. Mientras que en el hogar del sospechoso ellos tocaron en la puerta y procuraron por él, en la casa de un tercero desconocido ellos miraron por una ventana entreabierta para averiguar lo que ocurría en el hogar a esa hora de la madrugada y verificar si el sospechoso estaba de visita en el lugar.

Por otro lado, este no es el caso en que desde la vía pública se puede observar claramente el interior de una residencia. Todo lo contrario, en este caso los agentes tuvieron que estacionar su auto y caminar por el área pavimentada de entrada hasta llegar a la parte frontal de la residencia. Una vez cruzaron el *curtilage* de la casa, hicieron un esfuerzo para observar a través de una ventana de metal que estaba entreabierta. Además, el hecho de que las ventanas del resto de la casa estaban cerradas es indicativo de la intención de la peticionaria de mantener barreras que impidieran la visibilidad del interior de su hogar. De ordinario no esperamos que otras personas entren al *curtilage* y se acerquen a nuestras residencias *en horas de la madrugada* para observar a través de las ventanas lo que sucede en el interior. De modo que es razonable pensar que la expectativa de intimidad en el interior de una residencia es mayor y aumenta si las ventanas están entreabiertas o cerradas.

Considerando el esfuerzo *desplegado por el agente Ortiz Robledo al entrar al "curtilage" de la casa para adquirir visibilidad a través de una ventana a medio abrir, en unión a la expectativa razonable de intimidad que la peticionaria poseía en el interior de su residencia, particularmente durante la noche y*

*en la madrugada, concluimos que la conducta del agente constituyó un registro y allanamiento irrazonable.*

██  La conducta desplegada por los agentes del orden público en este caso no puede ser convalidada por los tribunales. Nuestra Constitución protege la expectativa razonable de intimidad de los ciudadanos, particularmente en sus hogares, y no podemos autorizar a la Policía a atravesar subrepticiamente el *curtilage* para atisbar por las ventanas de nuestras residencias sin la autorización judicial correspondiente. De lo contrario, estaríamos tolerando que la Policía utilice métodos investigativos que violan la dignidad del ser humano y son contrarios a nuestro sistema democrático.(5)

VI

Ahora bien, el Estado plantea que existía una orden de arresto contra el Sr. Jaime Colón Vega y que había motivos fundados para creer que éste se encontraba en la residencia de la peticionaria. Por tal razón sostiene que el acto de observar a través de la ventana, así como el arresto y registro posterior, estaban autorizados. No tiene razón.

██  En el caso *Steagald v. United States*, 451 U.S. 204 (1981), el Tribunal Supremo de Estados Unidos se enfrentó a una controversia similar a la del caso de autos. Allí unos agentes de la administración federal de drogas y narcóticos (DEA) tenían una orden de arresto contra el señor Lyons. Se dirigeron a la residencia del señor Steagald ante la creencia de que Lyons se encontraba allí. Sin tener una orden de allanamiento en contra de

_____

(5)  En el pasado, al interpretar el Art. 368 del Código Penal de 1937, señalamos que el atisbar por las ventanas de una residencia o utilizar distintos tipos de instrumentos para lograr acceso a lo que sucede en el interior de una residencia, configuraba el delito de perturbación de la paz. *Pueblo v. Figueroa Navarro*, 104 D.P.R. 721, 726 (1976); *Ramos v. Tribunal de Distrito*, 73 D.P.R. 417, 419 (1952). Si a través de esas decisiones censuramos ese tipo de práctica para las personas particulares, fundamentándonos en el derecho a la paz y tranquilidad de las personas en sus hogares, hoy no podemos autorizar al Estado a que utilice ese tipo de práctica que atenta contra el derecho fundamental a la intimidad.

Steagald, los agentes registraron su residencia y encontraron evidencia incriminatoria contra él, procediendo a arrestarlo. Sobre la actuación de los agentes, el Tribunal Supremo resolvió que, *en ausencia de consentimiento o de circunstancias apremiantes, para poder penetrar en la casa de un tercero con el propósito de arrestar a un sospechoso se requiere que los agentes obtengan una orden de allanamiento previa.* El Tribunal sostuvo que viola la Cuarta Enmienda *el registro en casa de tercero que se efectúa con una mera orden de arresto en contra de un sospechoso.* Al establecer esa doctrina, el Tribunal entendió que el requisito de una orden de allanamiento previa no afectaba significativamente la labor investigativa del Estado, en comparación con la infracción a las garantías constitucionales presentes. Añadió que el tercero tiene una expectativa de intimidad de estar libre de invasiones irrazonables en su hogar. Sobre la insuficiencia de la orden de arresto señaló que ésta sirve para identificar la persona que es sospechosa de cometer un delito y para protegerlo de un arresto y registro ilegal. Sin embargo, ésta no protege adecuadamente la intimidad y privacidad del tercero en su hogar. Véase Resumil, *op. cit.*, Secs. 7.20–7.22, págs. 191–196.

Con respecto a la necesidad de la orden de allanamiento, el Tribunal razonó que el propósito de ese requisito era ubicar a un funcionario judicial neutral que determinara causa probable para creer que el sospechoso está en la residencia que se pretende registrar. *Steagald v. United States*, supra, págs. 213–214. Con esta medida el Tribunal entendió que se evitaría la posibilidad de que con una orden de arresto contra una persona se produjeran innumerables registros en hogares de familiares y amigos del sospechoso, violando la Cuarta Enmienda y afectándoles a todos ellos su derecho a la intimidad. *Steagald v. United States*, supra, pág. 215.

Establecida esa norma jurisprudencial, la doctrina ha ido evolucionando y se han establecido unos criterios muy definidos sobre la protección constitucional del tercero a no estar sujeto a registros y allanamientos irrazonables. Véanse: LaFave, *op. cit.*, Vol. II, Sec. 6.1, págs. 561–575; *Pembaur v. Cincinnati*, 475 U.S.

469, 474 (1986); J.D. Harbaugh y N.L. Faust, *"Knock on Any Door"—Home Arrrests After Payton and Steagald*, 86 Dick. L. Rev. 191, 214 (1982).

▋ Así por ejemplo, la excepción del consentimiento requiere que el dueño, residente o cualquier persona con suficiente control sobre la admisión de visitantes al hogar *voluntariamente* consienta la entrada de los agentes del orden público. LaFave, *op. cit.*, Vol. II, Sec. 6.1(c), pág. 582 y casos allí citados. Véase D.K. Kagehiro y W.S. Laufer, *The Assumption of Risk Doctrine and Third-Party Consent Searches*, 26 Crim. L. Bull. 195, 197–204 (1990). De igual forma, la jurisprudencia ha reconocido como excepción la llamada persecución en caliente (*hot pursuit*). *United States v. Santana*, 427 U.S. 38 (1976); *Warden v. Hayden*, 387 U.S. 294 (1967); *Welsh v. Wisconsin*, 466 U.S. 740 (1984). Esta excepción permite que los agentes entren y registren la residencia de un tercero cuando tras una persecución inmediata y continua de un sospechoso, éste se interne en dicho lugar. Véase LaFave, *op. cit.*, Vol. II, Sec. 6.1(d), págs. 585–587.

▋ Con respecto a las circunstancias apremiantes, como excepción al requisito de poseer una orden de allanamiento, se han establecido directrices precisas. En términos generales se requiere que, a la luz de la totalidad de las circunstancias, los agentes del orden público demuestren que existe urgencia para la acción policial debido a la existencia de circunstancias que impiden la obtención de la orden. LaFave, *op. cit.*, Vol. II, Sec. 6.1(f), pág. 595; *Michigan v. Tyler*, 436 U.S. 499 (1978); Donnino and Girise, *Exceptional Circumstances for a Warrantless Home Arrest*, 45 Alabama L. Rev. 90 (1980).

Dentro de las circunstancias apremiantes se pueden considerar, entre otras cosas, las siguientes: el riesgo para la seguridad pública y para la Policía si no se actúa con premura; la gravedad del delito imputado al sospechoso; la posibilidad de que la evidencia sea destruida; la posibilidad de fuga, y si el sospechoso genera violencia que produzca un claro e inminente peligro en la vida de los agentes. *Nineteenth Annual Review of Criminal*

*Procedure: United States Supreme Court and Courts of Appeals, 1988–89*, 78 Georg. L. J. 699, 739–748 (1990); *U.S. v. Curzi*, 867 F.2d 36, 41 (1er Cir. 1989); *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970).

Finalmente, mediante la vigilancia correspondiente, los agentes del orden público *deben obtener suficiente información para creer que el sospechoso se encuentra en casa del tercero y deben demostrar que, a la luz de las circunstancias, sería irrazonable ir en búsqueda de una orden de allanamiento.* Véase Harbaugh y Faust, *supra*, págs. 209–230.

## VII

Expuesto el estado de derecho aplicable, en este caso tenemos que concluir que el registro realizado por los agentes del orden público en la residencia de la peticionaria y su posterior arresto fue ilegal e irrazonable. En primer lugar, los agentes no disponían de una orden de arresto contra la peticionaria ni una orden de allanamiento de su residencia. Tampoco están presentes las excepciones recogidas en la doctrina puertorriqueña para que los agentes entraran y registraran su residencia prescindiendo de una orden de allanamiento.

La peticionaria no consintió para que los agentes del orden público entraran a su casa. A pesar de existir unas contradicciones en la prueba con respecto al lugar donde fue arrestada la peticionaria, quedó claramente establecido que quien abrió la puerta y el portón exterior fue Colón Vega (T.E., págs. 73–74) y que lo arrestaron inmediatamente. T.E., págs. 68 y 84. Esta no es la persona que la jurisprudencia ha autorizado para consentir la entrada de los agentes en la residencia de un tercero. *Pueblo v. Narváez Cruz*, 121 D.P.R. 429 (1988).

Por otro lado, los hechos de este caso no configuran la excepción de la persecución en caliente (*hot pursuit*), *United States v. Santana*, supra, o del registro incidental a un arresto. Colón Vega salió de la residencia tan pronto Ortiz Robledo le informó de su presencia y lo amenazó con derribar la puerta. El

sospechoso no resistió el arresto ni intentó evadirse. Todo lo contrario, al oir la llamada de la Policía, Colón Vega abrió el portón exterior de rejas y se entregó inmediatamente en el portal. El material delictivo no se encontraba en el área inmediata donde se efectuó el arresto de Colón Vega y el registro se realizó en otra parte de la casa.

Por constituir testimonio estereotipado, tampoco aceptamos la versión del agente de que, una vez arrestado, Colón Vega fue autorizado a buscar unos cigarrillos y que el sospechoso los llevó al interior de la casa donde se encontraban los materiales delictivos. Resulta increíble que cuando una persona es arrestada en la entrada de una residencia, solicite y se le conceda el permiso para entrar a la misma tan sólo para buscar cigarrillos, cuando sabe que en el interior, a plena vista, hay material delictivo. *Pueblo v. González del Valle*, 102 D.P.R. 374 (1974); *Pueblo v. Almodóvar*, 109 D.P.R. 117 (1979).

Además, las circunstancias de este caso no configuraban una necesidad apremiante. Tomando los hechos tal y como los expuso el agente Ortiz Robledo y descartando las contradicciones en que incurrió en su testimonio, vemos que se trataba de un operativo policíaco donde siete agentes rodearon la residencia de la peticionaria bajo la creencia de que el sospechoso se encontraba en el lugar. T.E., pág. 48. Para verificar si Colón Vega se encontraba en la residencia, los agentes no tenían que sigilosamente atisbar por una ventana. Ellos pudieron haber utilizado otros métodos investigativos, que no menoscabaran los derechos constitucionales de la apelante, para verificar si el sospechoso estaba en ella o para averiguar si la misma se utilizaba para actividades delictivas.

La prueba no refleja que el sospechoso fuese un prófugo de la justicia, una persona violenta o peligrosa, o que existiese una expectativa razonable de que escapara. Tampoco se desprende que los agentes tuvieran conocimiento de que anteriormente el arrestado había resistido violentamente un arresto. De hecho, de la transcripción surge que los agentes no consideraban a Colón Vega como una persona violenta o evasiva. Cuando fueron a su residencia no la registraron, limitándose a indicarle a su esposa

que tenían una orden de arresto en su contra y que pasara por la división de drogas. En esas circunstancias, se nos hace difícil creer que el sospechoso fuese una persona peligrosa.

La doctrina que adoptamos hoy no conflige con nuestra decisión en *Pueblo v. Espinet Pagán*, 112 D.P.R. 531 (1982). Los hechos que rodearon esa decisión son claramente distinguibles del caso de autos. En aquel entonces los agentes del orden público tenían una requisitoria contra un conocido y peligroso prófugo de la justicia. Recibieron unas confidencias de que esa persona se encontraba pernoctando en una casa deshabitada en una finca del municipio de Guayama. Los agentes se personaron al lugar y mantuvieron vigilancia. Lograron observar a una persona que, *bona fide*, se les pareció al evadido. Una vez identificado el sujeto, los agentes entraron al solar para arrestarlo. Cuando el sujeto percibe la presencia de los agentes, comienza a correr hacia el interior de la residencia. Uno de los agentes logra darle alcance, formándose un forcejeo en el balcón de la residencia. El sujeto resultó que no era el prófugo buscado. Una vez allí, los agentes observaron que la puerta del lugar estaba abierta y cerca de ésta estaban claramente visibles dos sacos abiertos, cuyo contenido era marihuana. Posteriormente, los agentes registraron la residencia, encontrando abundante cantidad de esa sustancia controlada.

Al resolver que la intervención de los agentes era válida, consideramos que a luz de los hechos particulares del caso se configuraban suficientes circunstancias apremiantes como para eximir a los agentes del requisito constitucional de procurar una orden de registro y allanamiento previo a la entrada del lugar. La condición de peligrosidad del supuesto prófugo y la existencia de una requisitoria en su contra, el hecho de que la residencia en cuestión era una estructura deshabitada, el estar la puerta de la entrada completamente abierta y el intento de escape del sujeto hacia el interior de la estructura diferenciaron sustancialmente este caso con el de autos.

■ Finalmente, nos resta señalar que la Regla 17(6) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, tenemos que interpretarla a la luz de la doctrina constitucional que formulamos hoy. El derecho de los agentes de forzar la puerta o las ventanas de una residencia para efectuar un arresto opera en armonía con las garantías constitucionales que prohíben los registros y allanamientos irrazonables. De igual forma, ese derecho reconocido estatutariamente tiene que conformarse a las doctrinas e interpretaciones jurisprudenciales de las referidas cláusulas constitucionales. Por tal razón, el derecho a forzar la entrada en la residencia de un tercero para arrestar a un sospechoso tiene que satisfacer los requisitos que hoy hemos establecido.

Por los fundamentos antes expuestos, *la evidencia incriminatoria ocupada por los agentes del orden público en el hogar de la peticionaria fue producto de un registro ilegal y procede su supresión en el proceso criminal contra la peticionaria. Se revoca la resolución recurrida y se devuelve el caso al foro de instancia para la continuación de los procedimientos.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron sendas opiniones disidentes.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Desde el primer momento hemos sostenido que es menester —en buena metodología decisoria— una exposición meticulosa y completa del trasfondo fáctico según la prueba *creída* por el Tribunal Superior, Sala de Humacao (Hon. Gilberto Gierbolini, Juez), en ocasión de declarar sin lugar la moción de supresión de

---

(6) "Cuando una persona particular realizare un arresto por un delito grave (*felony*), y cuando en cualquier caso lo realizare un funcionario del orden público, podrá forzarse cualquier puerta o ventana del edificio en que estuviere la persona que ha de ser arrestada, o de aquél en que ellos tengan fundamentos razonables para creer que estuviere dicha persona, después de haber exigido la entrada y explicado el propósito para el cual se deseare dicha entrada." 34 L.P.R.A. Ap. II.

evidencia presentada por Daisy Rivera Colón. *A fin de cuentas, los hechos activan el derecho y no a la inversa.*

Veremos que la opinión mayoritaria suscrita por el Juez Asociado Señor Hernández Denton —en su tercera versión— falla al no describir adecuadamente, y de manera precisa, el entorno físico pertinente: una residencia y sus alrededores. Además, se incurre en una apreciación errónea de la conducta de los protagonistas y, por ende, en la aplicación de las normas correctas de derecho.

## I

El 26 de agosto de 1988 la Policía diligenció varias órdenes de arresto en el Municipio de Fajardo. En este operativo coordinado participó, entre otros, Esteban Ortiz Robledo, agente con varios años de experiencia en la investigación y persecución del tráfico ilegal de sustancias controladas. T.E., pág. 14.

Ortiz Robledo conocía a Jaime Colón Vega, contra quien existía una orden de arresto por alegadamente distribuir heroína a un agente encubierto. T.E., págs. 15 y 16–17; *Exhibit* I. Sabía que vivía con una dama en un apartamiento de segunda planta, en cuyos bajos había un colmado, situado en la Barriada La Loma del Viento. T.E., págs 16 y 100–101. También, que Colón Vega poseía y usaba una guagua Mazda, roja y blanca, *distinguible de las demás* por su buena condición y peculiar "capotita" atrás. T.E., págs. 18–19 y 116. Varias veces la había visto estacionada frente a la residencia de la Sra. Daisy Rivera Colón, a la cual Colón Vega visitaba frecuentemente. T.E., págs. 19–22.

La prueba revela que la residencia de Rivera Colón está ubicada en la Urb. Veve Calzada, Calle 6, D-16, Fajardo. La misma forma parte de estructuras residenciales contiguas, tipo hilera (*Row Houses*). Situados de frente, desde la acera, la misma tiene un pequeño solar dividido en dos (2) áreas. A la izquierda, está la entrada pavimentada de cemento y hacia la derecha un área sembrada de grama. No hay verja alguna. La entrada pavimentada termina con una reja exterior y portón. Inmediatamente

después de ese portón hay dos (2) puertas, una de frente y otra hacia la derecha. Al lado del portón, la estructura tiene una pared con cuatro (4) ventanas tipo "miami". *El portón de reja y la primera de estas ventanas están separadas sólo por un mechón de hormigón de pocas pulgadas.* Desde el portón contiguo a las ventanas, nada impide a una persona acercarse a las rejas o a la pared con ventanas. *Obviamente, para llegar al interior de la estructura hay que caminar hacia el portón de rejas sobre el área pavimentada de acceso.*

Siguiendo fielmente una fotografía (Anejo 1, Defensa), hemos preparado el croquis ilustrativo siguiente:

Con la información que poseía el agente Ortiz Robledo sobre Colón Vega, lo primero que hizo, naturalmente, fue tratar de arrestarlo en su apartamiento residencial en la Bda. Lomas del Viento. Inquirió con un muchacho y la señora. Ambos le dijeron que no estaba. El agente optó por informarles sobre la orden de arresto y que debería pasar por la División de Drogas. T.E., págs. 100–101. Como no se encontraba allí y conocía que Colón Vega frecuentaba la residencia de Rivera Colón —a esa hora, 4:30 A.M. aproximadamente— se dirigió allá inmediatamente. T.E., pág. 21.

Al arribar, efectivamente vió y reconoció la guagua de Colón Vega estacionada al frente. Desde la acera notó, además, que la ventana más próxima al portón de rejas estaba entreabierta. T.E., págs. 22–23 y 27. Caminó, entonces, por la entrada de cemento hacia el portón de rejas. Tenía un candado. T.E., pág. 30. Por la ventana "pegadita" e inmediata —que estaba semiabierta— había visibilidad, ya que en el interior (sala) existía una luz encendida. T.E., pág. 32. En estas circunstancias, el agente Ortiz Robledo se movió "de un pie a dos". T.E., págs. 31–33. Así situado, a través de la ventana pudo observar a Colón Vega, quien en unión a la señora Rivera Colón, envasaban un polvo blanco, que a su juicio era cocaína. T.E., págs. 33–37. Acto seguido, se identificó como policía, llamó a Colón Vega y le ordenó que abriera. *Este no abrió.* Por el contrario, el agente vio cuando ambos recogieron de una mesa unas envolturas, se dirigieron al baño y oyó un sonido análogo a cuando se descarga un inodoro. T.E., págs. 38–39 y 69. Ante esta *situación apremiante,* amenazó a Colón Vega de que rompería la puerta si no le abría. *Al "ratito" éste vino, abrió y le dio acceso.* Íd. El agente Ortiz Robledo le informó que estaba arrestado. Colón Vega le dijo que iba a buscar unos cigarrillos y él, cautelarmente, lo siguió. Fue, entonces, que vio *un revólver sobre la mesa,* una bolsa de papel de estraza llena de picadura de marihuana, una envoltura plástica con polvo blanco y otros objetos. En el trayecto hacia el baño e inodoro, otros agentes hallaron varias envolturas

plásticas más, incluso flotando dentro del inodoro.(1) T.E., págs. 38–39. Los análisis de campo, y posteriormente de laboratorio, demostraron que se trataba de sustancias controladas. T.E., págs. 42–43.

Colón Vega y la señora Rivera Colón fueron arrestados y acusados por violar la Ley de Sustancias Controladas de Puerto Rico y la Ley de Armas de Puerto Rico. Oportunamente, ella solicitó que se suprimiera la evidencia ocupada.

## II

Al igual que el ilustrado foro de instancia, consideramos legítima y razonable la conducta del agente Ortiz Robledo y admisible la evidencia ocupada. Esta conclusión está apuntalada en el fiel cumplimiento de los requisitos de la doctrina de objeto ilegal a plena vista. Ésta, según señaláramos en *Pueblo v. Conde Pratts*, 115 D.P.R. 307, 340 (1984), "autoriza y convalida una incautación, sin orden judicial, cuando un agente del orden público, al realizar inicialmente una intrusión válida, observa el objeto desde una posición legítima y de la cual tenía visión; tiene la certeza o razonable creencia de la naturaleza delictiva del objeto; y lo descubre 'inadvertidamente'". Conviene, pues, una disección de cada uno de estos requisitos.

---

(1) El *Exhibit* 2 de la defensa —Declaración Jurada de Esteban Ortiz Robledo— *ad verbatim*, describe así lo ocupado:

". . . un revólver marca Smith and Wesson, calibre 38, modelo 60, serie R-92974 color niquelado de 5 tiros cargado con 5 balas, de 11/2 pulgada de cañón, dos envolturas plásticas con una línea roja y con cierre de presión y con el número 4 conteniendo ésta[s] en su interior un polvo blanco de supuesta cocaína. Una envoltura plástica transparente con una línea roja y cierre de presión conteniendo en su interior un polvo blanco cremoso de supuesta heroína, 8 envolturas de papel aluminio verde a manera de deck, conteniendo en su interior supuesta heroína. Una bolsa plástica transparente, conteniendo en su interior 17 envolturas plásticas transparentes conteniendo cada una de ellas una sustancia pastosa de supuesta cocaína, cuatro bolsas de papel e[s]traza cogidas con tape color crema conteniendo cada una de ellas en su interior 20 envolturas tipo cono conteniendo cada una de ellas en su interior picadura de supuesta marihuana, 157 envolturas tipo cono y selladas con tope conteniendo cada una de ellas picadura de supuesta marihuana, una bolsa plástica color amarillo y con dos agarradores con letras que leen 'GRANDE' y otros, conteniendo en su interior picadura de supuesta marihuana, dos bolsas de papel estraza conteniendo cada una de ellas picadura de supuesta marihuana, tres bolsas plásticas transparentes con línea color amarillo y azul conteniendo una de ellas picadura de supuesta marihuana."

*El eje de esta controversia es la legalidad de la entrada del agente Ortiz Robledo al predio de la residencia de la señora Rivera Colón. En las circunstancias de autos hay que determinar, como requisito inicial, si dicha entrada constituyó o no un registro. A su vez, tal determinación depende de la expectativa razonable de intimidad que tenía Rivera Colón en el portón de su casa.*

En *Pueblo v. Bogard*, 100 D.P.R. 565 (1972), incorporamos expresamente a *Katz v. United States*, 389 U.S. 347 (1967), y resolvimos que la garantía constitucional contra registros y allanamientos irrazonables *protege fundamentalmente a las personas y no a lugares específicos.* El enfoque de la opinión mayoritaria es contrario a esta casuística. Al analizar el problema a la luz de lo que comprende la zona contigua —terreno y estructuras accesorias (*curtilage*)— se obvia a *Katz v. United States*, supra, y se regresa a la vieja conceptualización de la protección en función de los conceptos propietarios del *common law*.[2]

Subsiguientemente, en *Smith v. Maryland*, 442 U.S. 735 (1979), se adoptó el criterio esbozado por el Juez Harlan en su opinión concurrente en *Katz v. United States*, supra. Para que una persona pueda albergar una expectativa razonable de intimidad tiene que cumplir con un criterio subjetivo y uno objetivo. *Primero*, la persona debe haber *exhibido* una expectativa subjetiva de intimidad. Esta no es una simple reserva mental, sino que ha de estar acompañada de actos afirmativos que demuestren, inequívocamente, la intención de alojar dicha expectativa. Véase Nota, *The Fourth Amendment in the Age of Aerial Surveillance: Curtains for the Curtilage?*, 60 N.Y.U. L. Rev. 725 (1985), citado con aprobación en W.R. LaFave, *Search and Seizure: A Treatise on The Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, Sec. 2.1(c), pág. 308 n. 63. *Segundo*, la

---

[2] En *Katz v. United States*, 389 U.S. 347 (1967), se revocó a *Olmstead v. United States*, 277 U.S. 438 (1928), donde se indicaba que no podía haber una violación a la Cuarta Enmienda a menos que hubiese ocurrido una violación física (*trespass*) del hogar o del *curtilage*.

expectativa demostrada por el individuo tiene que ser una que la sociedad reconozca como razonable. Desde su opinión disidente en *United States v. White*, 401 U.S. 745, 786 (1971), el Juez Harlan había señalado que en este subcriterio se debe "apreciar la naturaleza de la práctica en particular y el alcance de su impacto sobre el sentido de seguridad del individuo balanceado contra la utilidad de la conducta como técnica policíaca [*law enforcement*]". (Traducción nuestra.) De esta forma el criterio se autoregula y, lejos de ser estático, se ajusta a las necesidades sociales cambiantes.

### III

En virtud de lo expuesto, es evidente que desde el comienzo del operativo la conducta del agente Ortiz Robledo fue conforme a la ley. Veamos.

No es determinante el énfasis que pone la opinión mayoritaria respecto a que los agentes, cuando fueron a arrestar originalmente a Colón Vega en su residencia, no "corroboraron" la información ofrecida por su esposa de que no se encontraba allí. Opinión mayoritaria, pág. 686. ¿Qué importancia o tangencia ello tiene? ¿Significa que la mayoría entiende que los agentes debieron haber hecho una intromisión y registro total dentro de ese hogar? La realidad es que dichos agentes creyeron que allí no estaba. Esa apreciación fue correcta y, si algo revela, es prudencia y circunspección. *En nada altera el curso ulterior de entonces ir a la casa de la señora Rivera Colón.*

Igual ocurre con la conclusión, a renglón seguido, de que "se dirigieron a la casa de un tercero donde en ocasiones anteriores el agente había visto al sospechoso. Aunque no sabían quién residía en ese lugar . . .". Opinión mayoritaria, pág. 686. Este aserto es confuso y contradictorio, pues la prueba es clara: el agente Ortiz Robledo *conocía* que Colón Vega estacionaba su guagua frente a la residencia de la señora Rivera Colón, a quien visitaba frecuentemente.

Aclarada la veracidad y legitimidad de la gestión *inicial* policíaca, notamos que la señora Rivera Colón no demostró que

tenía una expectativa de intimidad *en el acceso a la entrada a su casa*. No había verja, seto vivo u otra barrera física que indicara su deseo de que toda persona interesada en procurar a alguien o en inquirir sobre cualquier información en su residencia lo hiciera desde la acera. *Por el contrario, cualquier averiguación requería que la persona se adentrase por la entrada pavimentada y la hiciese desde el portón de rejas. Tampoco demostró, mediante el uso de rótulos u otro medio, que albergaba dicha expectativa.* Sin dificultad, concluimos que no se cumple el primer requisito de *Katz v. United States*, supra.

A modo de paréntesis, la conclusión que antecede no debe interpretarse como que no hay expectativa de intimidad en las áreas inmediatas de un hogar. Aunque sí existe, la misma varía en grados, aun dentro de la misma área. No es un asunto de distancia, sino de conducta exhibida, de expectativa demostrada. *Sencillamente, en el caso de autos el único acceso para lograr una posición razonable y poder procurar a alguien en el interior de la residencia era la entrada pavimentada de cemento.* Era de esperarse que cualquier visitante —fuera amigo, vendedor o policía— se adentrase y cruzara ese camino pavimentado para llevar a cabo el propósito que allí le condujo. "Así, cuando la policía entra en propiedad privada para llevar a cabo una investigación o para cualquier otro propósito legítimo y limita sus movimientos a lugares donde se espera que un visitante vaya . . . *las observaciones que hace desde ese lugar no están cubiertas por la Cuarta Enmienda.*" (Traducción nuestra, notas suprimidas y énfasis suplido.) La Fave, *op. cit.*, Sec. 2.3(f), págs. 412–413.

Y es que, de acuerdo con el segundo requisito del criterio de *Katz v. United States*, supra, en las circunstancias de autos no se puede reconocer una expectativa *razonable* de intimidad. El agente Ortiz Robledo se acercó al portón de rejas siguiendo *"la manera usual de procurar a una persona o de llamar a su puerta"* (*Pueblo v. Álvarez Solares*, 95 D.P.R. 789, 795 (1968)) luego de haber visto la guagua Mazda de Colón Vega y haber así configurado —en virtud de sus conocimientos previos— motivos fundados para allí procurarlo. Si bien es cierto que de ordinario

una orden de arresto no autoriza a los agentes a entrar en la residencia de un tercero, *Steagald v. United States*, 451 U.S. 204 (1981), la misma sí le permite *procurar* a la persona contra quien se expidió. *Eso fue lo que hizo el agente Ortiz Robledo.*

Una vez ubicado legítimamente en el portón de rejas, dentro de la única entrada, el agente observó por la ventana contigua, a plena vista, lo que a su juicio y experiencia era la comisión de unos delitos *in fraganti*. El que la observación fuera, en esos instantes, una conducta deliberada no altera el resultado. La exigencia de que el descubrimiento se haga "inadvertidamente" ha cesado de ser una condición necesaria. Véase *Horton v. California*, 496 U.S. 128 (1990). Ya, en cuanto a dicho requisito, en *Pueblo v. Conde Pratts*, supra, pág. 340, habíamos señalado que no significaba que la

> . . . Policía, cuando investiga un caso o realiza un registro, deba actuar con miopía ocular o intelectual, ingenuamente o sin imaginación.
>
> El concepto "inadvertidamente" quiere decir que el agente no tenía conocimiento previo de la existencia, localización del objeto ilegal, y por lo tanto, no tenía intención o planes de incautarlo.

Y es que en "la prevención e investigación del crimen la Policía no es una esfinge egipcia obligada a adoptar una actitud reservada o enigmática". Íd., pág. 341.

Si bien la mayoría concluye que Colón Vega "no resistió el arresto ni intentó evadirse" (opinión mayoritaria, pág. 691), es obvio que, al ser llamado por el agente Ortiz Robledo, trató de pasarse de listo e intentó desaparecer la evidencia incriminatoria en el inodoro. Más aún, es inquietante que de un plumazo hayan caracterizado de "testimonio estereotipado" e "increíble" la versión del agente Ortiz Robledo (opinión mayoritaria, pág. 691) como única forma de poder revocar, aun cuando el ilustrado tribunal de instancia *expresamente* rechazó esa contención.

Ante esa situación, sostener que el registro tenía que limitarse al "área inmediata donde se efectuó el arresto" (opinión mayoritaria, pág. 691) atenta contra toda lógica y razonabilidad. Después de todo, el mismo fundamento que justifica un registro incidental

al arresto —seguridad de los agentes del orden público— opera a favor de un recorrido de protección (*protective sweep*). Véase *Maryland v. Buie*, 494 U.S. 325 (1990). Aquí había un revólver sobre una mesa susceptible de ser desaparecido o utilizado en contra de los agentes.

IV

Recapitulando, en las circunstancias particulares de este caso, el agente Ortiz Robledo no necesitaba una orden de allanamiento para entrar hasta el portón de rejas de la puerta principal de la residencia de la señora Rivera Colón y procurar a Colón Vega. Así lo reconoce la propia opinión mayoritaria al afirmar que "como parte de su función investigativa, la Policía puede *entrar* en áreas del *curtilage* de una residencia que esté *implícitamente* abierto al público con el propósito de conversar con los ocupantes de la residencia o *procurar a alguna persona*. *Pueblo v. Torres Resto*, [102 D.P.R. 532, 534 (1974)]". (Énfasis suplido.) Opinión mayoritaria, pág. 686.

Distinto a la conclusión mayoritaria (págs. 686–687), hemos visto que en esa gestión el agente Ortiz Robledo fue muy parco y limitó sus movimientos. No atravesó ni cruzó ninguna área del jardín. Tampoco es correcta la afirmación de que "caminó uno o dos pies" para mirar por la ventana. Opinión mayoritoria, pág. 677. Por el contrario, caminó y usó el único acceso definido —entrada pavimentada de cemento— hacia el portón de rejas. Lo encontró con candado. No sabemos, pues, a qué se refiere la mayoría cuando pretende que "tocar[a] la puerta principal . . .". Íd., pág. 686. Una vez allí, hizo lo que cualquier persona normalmente hubiese hecho en una gestión lícita de procurar a alguien. Se movió de "uno [a] dos pies" hacia la ventana contigua entreabierta —con luz en su interior— y, al hacerlo, vió la comisión de

unos delitos. Difícilmente esa conducta denota un *"esfuerzo*(3) para observar *a través* de una ventana de metal que estaba entreabierta". (Énfasis suplido.) Opinión mayoritaria, pág. 687.

Ante esta realidad, ¿cómo sostener una expectativa de intimidad si la dueña de la casa dejó abierta o entreabierta la ventana inmediatamente al lado del portón de la entrada principal? ¿Qué precauciones tomó la señora Rivera Colón para evitar que cualquier persona —visitante, vendedor, policía, etc.— pudiera ver hacia el interior? *Ninguna.* Distinto al argumento de la mayoría (opinión mayoritaria, pág. 687), *el haber ella dejado abierta sólo la ventana al lado del único portón de acceso,* ¿no es precisamente indicativo de una intención de que hubiera visibilidad en *ambas direcciones*, hacia el exterior y, por ende, también el interior?

Es una *injusticia* que, por vía de censura en el escolio 5, pág. 687, se *insinúe* que el proceder del agente Ortiz Robledo, al mirar por la ventana entreabierta, cae dentro del delito de alteración a la paz pública en su modalidad de *atisbar.* Art. 260 del Código Penal, 33 L.P.R.A. sec. 4521. Los casos citados son claramente distinguibles. Ciertamente no estamos ante la situación descrita en *Pueblo v. Figueroa Navarro*, 104 D.P.R. 721, 726 (1976), de una persona "rondando la casa, deteniendo el vehículo al frente de la misma, mirando insistentemente, haciendo uso de binoculares y utilizando una cámara con lente largo y retratando . . . ". Tampoco se trata de "atisbar por una de las ventanas de [una] residencia *en momentos en que el perjudicado y su esposa se disponían a dormir. . .*". (Énfasis suplido.) *Pueblo v. Figueroa Navarro*, supra, pág. 726. Véase *Ramos v. Tribunal de Distrito*, 73 D.P.R. 417, 419 (1952).

En este sentido es una *hipérbole judicial* —fuera de toda proporción fáctica— que la mayoría haya percibido que, configurada la controversia planteada, es si "podemos autorizar a la

---

(3) *"Esfuerzo.* (De *esforzar.*) m. Empleo enérgico de la fuerza física contra algún impulso o resistencia. ‖ *2.* Empleo enérgico del vigor o actividad del ánimo para conseguir una cosa venciendo dificultades. ‖ *3.* Ánimo, vigor, brío, valor. ‖ *4.* Empleo de elementos costosos en la consecución de algún fin. ‖ *5.* ant. Auxilio, ayuda, socorro." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. 1, pág. 588.

Policía a atravesar subrepticiamente el *curtilage* para atisbar por las ventanas de nuestras residencias sin la autorización judicial correspondiente". Opinión mayoritaria, pág. 687. Sobre todo, que para ello haya descansado en una apreciación errónea de la conducta de los protagonistas y en una descripción incompleta de las características físicas del lugar.

Por los fundamentos expuestos, confirmaríamos la resolución del Tribunal Superior, Sala de Humacao.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La opinión que emite el Tribunal en el presente caso: *parece* cumplir con el mandato y función que nos impone la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, pero desafortunadamente no lo hace; *parece* establecer un criterio (*test*) correcto respecto a la evaluación de la validez de un registro y allanamiento a la luz de las disposiciones de la citada Sec. 10, cuando lo cierto es que adopta uno erróneo; *parece* —en cumplimiento de nuestra jurisprudencia anterior sobre la materia— proteger y ampliar las garantías y derechos de nuestra ciudadanía contra registros y allanamientos ilegales, cuando la realidad es que los restringe; *parece* ser una ponencia que refleja fielmente los hechos sucedidos, cuando lo cierto es que manipula los mismos y crea una situación de hechos ficticia; *parece* ser una decisión correcta, pero resulta ser una completamente errónea; *parece*, en fin, hacer verdadera justicia, pero no consigue alcanzar dicha meta.

I

La opinión mayoritaria emitida comienza su "discusión doctrinaria" ratificando lo resuelto por este Tribunal en la decisión que se emitiera en *Pueblo v. Dolce*, 105 D.P.R. 422 (1976), y otras

decisiones posteriores,(1) a los efectos de que la garantía contra registros y allanamientos ilegales contenida en la Sec. 10 del Art. II de nuestra Constitución, ante, debe "examinarse exclusivamente" a la luz de la citada Sec. 10; que tenemos la facultad y el poder para interpretar dichas garantías "de forma más amplia" que la jurisprudencia constitucional norteamericana lo ha hecho en virtud de las disposiciones de la Cuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1, y que "aquí se aprobaron unas garantías más amplias que las que provee la Constitución federal . . .". Opinión mayoritaria, pág. 679.

*Ello no obstante*, a renglón seguido, la opinión mayoritaria adopta, "[p]or su valor persuasivo . . . el *enfoque analítico* de *Katz v. United States*, supra, y los *criterios de expectativa razonable de intimidad* de *Smith v. Maryland*, supra, al evaluar la validez de un registro *al amparo de la Sec. 10 del Art. II* de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*". (Énfasis suplido.) Opinión mayoritaria, pág. 685. *¿Qué significado y consecuencias jurídicas tienen para nuestro ordenamiento y ciudadanía que este Tribunal haya "adoptado" el enfoque analítico y los criterios expuestos por el Tribunal Supremo de los Estados Unidos en las antes mencionadas decisiones?*

Como se expone en la opinión mayoritaria emitida, a partir de la decisión que el Tribunal Supremo federal emitió en *Katz v. United States*, 389 U.S. 347 (1967) —y su progenie— se estableció que la protección que concede a los ciudadanos la Cuarta Enmienda de la Constitución federal, ante, "depende de si la persona tiene una *expectativa legítima de intimidad en el lugar registrado y si ésta es razonable*". (Énfasis suplido.) Opinión mayoritaria, pág. 682.

Como *corolario, o consecuencia inescapable*, de la norma establecida en *Katz v. United States*, ante, *se ha resuelto en la jurisdicción federal que no basta con que el imputado de delito demuestre que el registro y allanamiento en que el Estado obtuvo*

---

(1) Véanse: *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988).

*la evidencia delictiva fue uno ilegal e irrazonable.* Para que proceda la supresión de la evidencia, *el imputado de delito tiene que demostrar, en adición, que posee "capacidad" ("standing") para solicitar dicha supresión;* esto es, dicho imputado *tiene que demostrar que tenía, una "expectativa legítima y razonable de intimidad" en el lugar ilegalmente registrado.* Véanse: *Rakas v. Illinois,* 439 U.S. 128 (1978); *United States v. Salvucci,* 448 U.S. 83 (1980); *Rawlings v. Kentucky,* 448 U.S. 98 (1980); *United States v. Ross,* 456 U.S. 798 (1982); *Texas v. Brown,* 460 U.S. 730 (1983). En palabras sencillas, *en la esfera federal una evidencia delictiva ocupada por el Estado en un registro y allanamiento comprobadamente ilegal es admisible en un proceso judicial contra toda persona que haya sido acusada en relación con la misma que no pueda demostrar esa "expectativa legítima de intimidad" en relación con el lugar ilegalmente registrado.*

La antes mencionada norma jurisprudencial, *adoptada en el día de hoy* por el Tribunal, *no tiene cabida en nuestro ordenamiento jurídico.* Ello debido a la *terminología específica* en que está concebida la antes citada Sec. 10 del Art. II de nuestra Constitución, terminología que es "distinta" a la de la Cuarta Enmienda de la Constitución federal, ante.

Debe mantenerse presente que la citada Cuarta Enmienda de la Constitución federal establece, en lo pertinente, que "[n]o se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables . . .". Emda. IV, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 186. *La antes mencionada Sec. 10 del Art. II de nuestra Constitución, por el contrario, categóricamente dispone que:*

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación,

describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

*Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.* (Énfasis suplido.) Const. E.L.A., *supra*, ed. 1982, pág. 299.

Dicha situación la hicimos constar —y resaltamos— en la opinión concurrente que emitiéramos hace cinco años en *Pueblo v. Rovira Ramos*, 116 D.P.R. 945 (1986). Al referirnos, y explicar, la diferencia entre ambas disposiciones constitucionales, expresamos en el citado caso de *Pueblo v. Rovira Ramos*, ante, págs. 956–957, que:

No debemos perder de vista . . . que en la jurisdicción federal se ha resuelto que la llamada "regla de exclusión" no goza por sí misma de rango constitucional, sino que es meramente una medida profiláctica de los derechos bajo la citada Cuarta Enmienda. Por ende, en esa jurisdicción la misma está sujeta a modificación o abolición. *Illinois v. Gates*, 462 U.S. 213, 223 (1983). En Puerto Rico, por el contrario, nuestra Constitución expresamente dispone, en lo pertinente, que la evidencia obtenida en violación de la citada Sec. 10 del Art. II *"será inadmisible* en los tribunales". (Énfasis suplido.) *Esta diferencia en el "rango jurídico" de la regla de exclusión existente entre la jurisdicción federal y la nuestra hace, a nuestro entender, inaplicable la jurisprudencia federal que niega los efectos de la referida regla de exclusión en casos donde el acusado no puede alegar y probar una "expectativa de privacidad" en relación con el lugar registrado o allanado.*

Como es sabido, la Enmienda Cuarta de la Constitución federal "describe el ámbito mínimo de la garantía que reconoce. Los estados no pueden achicar esas fronteras, pero pueden expandirlas". *Pueblo v. Dolce*, 105 D.P.R. 422, 427 (1976). En otras palabras, habiendo el Tribunal Supremo de Estados Unidos reconocido expresamente la facultad de los estados federados para expandir la garantía contra registros y allanamientos ilegales más allá de los límites de la citada Enmienda Cuarta, *Cooper v. California*, 386 U.S. 58, 62 (1967), este Tribunal, al interpretar la Constitución del Estado Libre Asociado de Puerto Rico, *puede ampliar* el ámbito de los derechos humanos de los residentes de nuestro país. *Pueblo v. Dolce*, ante, pág. 428.

*En lo que respecta a la "capacidad" (standing) de un imputado de delito para solicitar la supresión del material delictivo en*

*relación con el cual se le procesa, somos del criterio que bajo nuestro ordenamiento jurídico si un ciudadano es acusado de la supuesta comisión de un delito público y la evidencia que se pretende utilizar para probar su culpabilidad fue el producto de un registro, a esa persona no se le debe negar la "capacidad" para cuestionar la legalidad del mismo. En otras palabras, si el Estado pretende relacionar a un acusado con determinado material delictivo y así privarlo de su libertad con motivo de ello, dicho ciudadano debe tener el derecho automático de cuestionar la legalidad de la forma o manera en que el Estado advino en posesión del referido material.* (Énfasis suplido y en el original.)

*La posición que en dicho entonces asumimos —y que hoy personalmente ratificamos— curiosamente fue endosada en aquel entonces por dos de los integrantes del Tribunal que hoy suscriben, de manera entusiasta, la posición contraria.* Ello no es la primera vez que ocurre en el "nuevo" Tribunal; posiblemente no sea la última. Dicha situación no debe sorprender a nadie; después de todo, los integrantes de este Tribunal también tienen derecho a cometer "errores de juventud".

*Ello, sin embargo, no es importante. Lo verdaderamente fundamental, y trágico, para nuestro ordenamiento jurídico, lo es que la opinión mayoritaria emitida en el presente caso* —al importar, y copiar indiscriminadamente, la referida norma de la jurisprudencia federal— *establece un criterio ("test") para evaluar la validez de los registros y allanamientos que resulta ser contrario a las expresas disposiciones de la citada Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico*; incumpliendo así el Tribunal con el mandato, y función, que le impone la referida disposición constitucional.

## II

Una lectura cuidadosa de la opinión mayoritaria emitida *revela un monumental error, o falla, en la misma.* A pesar de que así no se llega a aseverar expresamente, se *sugiere en*, o se puede *inferir de*, la misma que el Tribunal entiende que el curso correcto a seguir por los agentes del orden público esa madrugada lo era

el procurar, y obtener, una orden de allanamiento en relación con la residencia de la peticionaria Daisy Rivera Colón; ello en lugar de éstos cometer la "infracción" de violar el *curtilage* de la misma con el propósito de indagar sobre si la persona contra quien pesaba la orden de arresto se encontraba o no en dicha residencia.(2) Dicha "sugerencia" resulta ser sumamente peligrosa para nuestra ciudadanía.

Recordemos que *toda* la información con que los agentes del orden público contaban al llegar esa madrugada a la residencia de la peticionaria Rivera Colón consistía en su conocimiento de que la persona contra quien pesaba la orden de arresto, Jaime Colón Vega, visitaba dicha casa con alguna frecuencia y que, en esa noche en particular, observaron un vehículo de motor, parecido o similar al que Colón Vega poseía, estacionado frente a la residencia en controversia. Nada más, nada menos.

Procede que nos preguntemos, en consecuencia, si resulta ser correcto en derecho lo sugerido por la mayoría del Tribunal a los efectos de que en dicha situación procedía que los agentes procuraran la expedición de una orden de allanamiento contra esa residencia *meramente a base de la posibilidad de que Colón Vega se encontrara en la misma.* ¿Entiende la mayoría del Tribunal que esa información, *escueta y escuálida,* constituye *suficiente "causa probable"* para la expedición de una orden de allanamiento al amparo de las disposiciones de la Sec. 10 de la Carta de Derechos de nuestra Constitución, ante? ¿No se supone —conforme se expresa en la opinión mayoritaria— que interpretemos "las garantías contra registros y allanamientos de forma *más amplia* que la jurisprudencia constitucional norteamericana"? (Énfasis suplido.) Opinión mayoritaria, pág. 680. Resulta pertinente señalar que, *inclusive,* en la jurisdicción federal se ha resuelto que la mera posibilidad, o sospecha, de que un ciudadano que es buscado por las autoridades policíacas pueda encontrarse

---

(2) A esos efectos, véase lo expresado en la opinión mayoritaria en las siguientes *páginas* 678 y 679 (líneas 30–31, respectivamente); *página* 687 (líneas 23–26); *páginas* 688–689 (líneas 15–22 y 26–31, y 1–6, respectivamente); *página* 689 (líneas 7–13); *página* 690 (líneas 1–3 y 22–24), y *página* 690 (líneas 29–32).

en una residencia en particular —basada dicha sospecha en información de que el sujeto ha visitado la misma en el pasado— *no* constituye "causa probable" (*reasonable grounds*) para la expedición de una orden de registro y allanamiento contra la residencia en cuestión. *Creighton v. City of St. Paul*, 766 F.2d 1269, 1273 (1985).

¿Estamos enviando, respecto a esta clase de situación, un mensaje o directriz correcta a la Policía de Puerto Rico y a nuestros tribunales de instancia? ¿No resulta ser la actuación de la Policía en el presente caso —al originalmente limitarse a inquirir en la residencia de la peticionaria sobre el paradero de Colón Vega— la más correcta y razonable a la luz de las circunstancias y hechos particulares del caso? *¿Acaso era preferible que la Policía, en lugar de inquirir por Colón Vega, desde un principio allanara y registrara la residencia de la peticionaria?* ¿Es consciente la mayoría del Tribunal de las consecuencias de lo que está expresando y sugiriendo? *La situación, cuando menos, resulta altamente preocupante.*

La única otra posible alternativa a la que se puede referir la mayoría del Tribunal, esto es, la de que el Agente Ortiz Robledo obtuviera la orden de allanamiento *luego de haber hecho* la observación en controversia, *es igualmente inaceptable e improcedente en derecho.* Ello así ya que si la acción del mencionado funcionario, de acercarse hasta el portón de la residencia y mirar a través de la ventana entreabierta de dicha residencia era, *conforme se concluye en la opinión mayoritaria,* una ilegal, *¿podía expedirse por magistrado competente una orden de allanamiento contra dicha residencia a base de una evidencia obtenida mediante conducta que es ilegal y violativa de la Sec. 10 del Art. II de nuestra Constitución, ante, y de la Cuarta Enmienda de la Constitución de los Estados Unidos?* La contradicción en dicho razonamiento es tan obvia que no amerita que nos extendamos en la discusión de la misma.

Como podemos notar, y tal como adelantáramos al comienzo de la presente ponencia, la decisión hoy emitida por una mayoría de los integrantes del Tribunal *desatiende totalmente el mandato*

contenido en la citada Sec. 10 del Art. II de nuestra Constitución *al establecer un "criterio" ("test"), respecto a la evaluación de la validez de un registro y allanamiento, que es totalmente contrario a las expresas disposiciones de la mencionada disposición constitucional.* Por otro lado, la opinión mayoritaria, en lugar de expandir la protección de nuestra ciudadanía contra registros y allanamientos ilegales e irrazonables, lo que hace es propiciar que éstos se puedan llevar a cabo bajo un aparente manto de legalidad; ello por razón de que, como hemos visto, la opinión mayoritaria —al "sugerir" que procede la expedición de una orden de allanamiento contra una residencia a base de la *mera posibilidad* de que una persona contra quien pende una orden de arresto se encuentre en la misma— *debilita grandemente la concepción de lo que constituye "causa probable" a la luz de las disposiciones de la Sec. 10 del Art. II de nuestra Constitución,* ante.

La presente decisión, unida a la que recientemente emitiera este Tribunal en *Pueblo v. Rivera Rodríguez,* 123 D.P.R. 467 (1989) —en la cual se resolvió, en síntesis, que el magistrado que expide la orden de allanamiento *no* tiene la obligación de examinar personalmente al declarante— *evidencia un peligroso viraje en nuestra jurisprudencia sobre la materia.* La laxa norma hoy indicada —sobre qué constituye "causa probable" al amparo de la citada disposición constitucional— ciertamente no es la que ha tenido en mente este Tribunal cuando en variadas ocasiones en el pasado ha reiterado "su facultad de ampliar las garantías contra registros e incautaciones más allá de los límites de la Cuarta Enmienda" de la Constitución federal. *Pueblo v. Malavé González,* 120 D.P.R. 470, 475 (1988); *Pueblo v. Dolce,* ante; *Pueblo v. Falú Martínez,* 116 D.P.R. 828, 837 (1986). Es por ello que la cita que de dichas decisiones se hace en la opinión mayoritaria hoy emitida únicamente puede deberse a una de tres razones: ignorancia jurídica, confusión o un increíble grado de hipocresía judicial.

## III

La errónea decisión emitida en el presente caso es, desafortunadamente para nuestro sistema de justicia, *el resultado directo de la creación por el Tribunal de una situación de hechos con el propósito de poder establecer una norma de derecho "pre pensada y enlatada" sobre "curtilage".* El Tribunal se ha olvidado de que la creación —*tipo laboratorio jurídico o corte de práctica ("moot court")*— de situaciones de hechos ficticias impide que alcancemos el fin primordial que nos impone el descargo responsable de nuestro cargo, cual es: *resolver los casos conforme los hechos específicos y particulares de éstos con el propósito de impartir justicia en la forma más correcta posible.* Nos explicamos:

Un examen de la *fotografía de la residencia* —la cual unimos como Anejo 1 de la presente opinión disidente— y de la *transcripción de la declaración* que ante el tribunal de instancia prestara el Agente Esteban Ortiz Robledo es todo lo que se necesita para poder uno percatarse, *en primer lugar*, que la *única manera* en que dicho funcionario del orden público, o cualquier otro ciudadano, podía procurar a un residente, o invitado, en la residencia de la peticionaria Daisy Rivera Colón era *acercándose* al portón (de rejas) de la entrada de la misma, y, en *segundo lugar*, que *no* es correcto lo aseverado en la opinión mayoritaria a los efectos de que la ventana por la cual el agente Ortiz Robledo hizo su observación queda a "*varios* pies de la entrada, y separad[a] por una pared que sobresalía de las rejas de forma perpendicular hacia la acera . . .". (Énfasis suplido.) Opinión mayoritaria, pág. 677. *La fotografía "habla" por sí sola: la ventana del lado derecho de la casa está a escasamente un pie del portón de rejas de la misma.* (3)

Sobre el derecho, y obligación, del agente Ortiz Robledo a atravesar el *curtilage* de la residencia de la peticionaria Rivera

---

(3)  Así, inclusive, lo declaró el agente Ortiz Robledo durante la vista de supresión de evidencia celebrada a nivel de instancia.

De la *página 31* de la Transcripción de Evidencia surge:

Colón y acercarse al portón de rejas de la misma con el propósito de procurar si allí se encontraba la persona contra quien pesaba la orden de arresto, somos del criterio que el mismo es un hecho que nadie —por lo menos, con alguna seriedad y un poco de conocimiento legal— puede cuestionar. En *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985), expresamos que los agentes de la Policía de Puerto Rico tienen *el derecho y la obligación*, de investigar toda querella sobre posible actividad delictiva en nuestra jurisdicción. Seis años más tarde, al ratificar lo expresado en *Pueblo v. Ortiz Martínez*, ante, sostuvimos *el derecho y obligación* de un agente del orden público de hacerle preguntas a dos ciudadanos —que se encontraban en la vía pública, cerca de un lugar donde se había accidentado un avión que contenía un cargamento de marihuana— con el propósito de investigar la posible conexión de éstos con el avión accidentado. *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762 (1991). *No vemos cómo pueda negársele facultad, y autoridad, a un agente del orden público que tiene en su poder una orden de arresto —que le autoriza a realizar el arresto de día o de noche— para cruzar el "curtilage" de una residencia con el propósito de indagar si en dicha residencia se encuentra esa persona, cuando este agente cuenta con información que indica la posibilidad de que la persona se pueda encontrar en la misma.*

Por otro lado tenemos que, una vez parado directamente frente a ese portón, el agente Ortiz Robledo, meramente moviéndose apenas una distancia de un pie hacia su derecha, *pudo observar sin dificultad alguna* —a través de una ventana que está localizada *inmediatamente al lado del portón*, la cual se encontraba *entreabierta*— que el coacusado Jaime Colón Vega, *contra quien pesaba una orden de arresto por infracción a la Ley de Sustancias Controladas*, y la peticionaria Rivera Colón *se encontraban enfrascados* en lo que, conforme la vasta experiencia del

---

"Hon. Fiscal:

"P. En relación a donde usted estaba parado que dijo anteriormente *frente* a ese portón, ¿a qu[é] *distancia usted quedaba de la ventana?*

"R. Es *pegadito*, como a *un* pie o dos." (Énfasis suplido.)

agente del orden público, *a todas luces era una operación que envolvía narcóticos.*

Calificando, sin base alguna, la conducta del funcionario del orden público como una de "atisbar" y haciéndonos *equivocadamente* creer —*a base de una acomodaticia e incompleta exposición de los hechos*—(4) que dicho funcionario para llegar frente al portón se había ilegalmente adentrado en los predios de dicha residencia, la opinión mayoritaria erróneamente concluye que la conducta hasta ese momento desplegada por el agente del orden público constituyó un registro y allanamiento irrazonable. Opinión mayoritaria, pág. 690.

Confrontado con el argumento del Estado de que los agentes del orden público tenían en su poder una válida orden de arresto contra el coacusado Colón Vega y de que éstos contaban, en adición, con información a los efectos de que éste se podía encontrar en la casa de la peticionaria Rivera Colón, se expresa en la opinión mayoritaria que el Tribunal Supremo federal ha resuelto— en *Steagald v. United States*, 451 U.S. 204 (1981)— que "el registro en casa de tercero que se efectúa con una mera orden de arresto en contra de un sospechoso" viola la Cuarta Enmienda de la Constitución de los Estados Unidos. (Énfasis suprimido.) Opinión mayoritaria, pág. 688. *Dicha válida y correcta norma jurisprudencial, sin embargo, no es aplicable a los hechos del caso ante nuestra consideración.* En el presente caso hay "algo más". La opinión mayoritaria no avala correctamente el hecho de que aquí el funcionario público observó, *desde un lugar donde legalmente podía estar,* conducta delictiva "*a plena vista*" que se estaba llevando a cabo *en la residencia* en controversia antes de efectuarse el arresto *en circunstancias en que, aún bajo la*

---

(4)  Una lectura de la opinión mayoritaria lleva a una interpretación incorrecta de la prueba que desfiló en la vista de supresión que celebrara el tribunal de instancia. *Los hechos son expuestos, en forma cuidadosa, con el propósito de lograr poder aplicarle a los mismos el derecho expuesto en la ponencia;* situación, o práctica, que *no* debería de ocurrir en un Tribunal como el nuestro.

*norma federal hoy adoptada por el Tribunal, no se puede reclamar una expectativa razonable de privacidad.*(5)

Ante dicha inescapable realidad, y aparentemente sin percatarse de ello, incurre la mayoría en el *monumental error* antes señalado. *Se sugiere en dicha ponencia —véase escolio 3— que lo jurídicamente procedente era que los agentes del orden público obtuvieran una orden de allanamiento para poder entrar y registrar la residencia de la peticionaria Rivera Colón*; ello, alegadamente, por razón de que en el presente caso no existían las circunstancias apremiantes que ameritan la incursión en el hogar del tercero sin una orden de allanamiento.

Independientemente del hecho de que si en algún caso ha existido una "circunstancia apremiante" —la posibilidad de destrucción de evidencia delictiva— lo es en el presente caso,(6) dicho señalamiento sobre obtención de una orden de allanamiento resulta ser completamente erróneo en relación con cualquiera de las únicas dos situaciones a las que concebiblemente se puede referir la opinión mayoritaria y a las cuales hicimos referencia, y discutimos, anteriormente.

## IV

En conclusión, somos del criterio que la actuación, *legítima y razonable*, del agente Ortiz Robledo al acercarse hasta el portón de la residencia de la peticionaria Rivera Colón con el propósito de

---

(5) En la opinión mayoritaria emitida se dice —a la página 687 de la misma— que "el hecho de que las ventanas del resto de la casa estaban cerradas es indicativo de la intención de la peticionaria de mantener barreras que impidieran la visibilidad del interior de su hogar".

Si dicho razonamiento es correcto, tenemos entonces que forzosamente concluir que el hecho de que la peticionaria dejara una ventana abierta —*situada al lado del portón de entrada de la casa*— implica que a ella no le interesaba tener privacidad en el comedor de la casa.

(6) Como surge de la opinión disidente del Juez Negrón García (pág. 697), el agente Ortiz Robledo declaró que vio a través de la ventana cuando la peticionaria Rivera Colón y el coacusado Colón Vega "recogieron de una mesa unas envolturas, se dirigieron al baño y oyó un sonido análogo a cuando se descarga un inodoro". Ello —destrucción de evidencia— ciertamente cualifica como una de las "circunstancias apremiantes" que tradicionalmente ha reconocido tanto la jurisprudencia del Tribunal Supremo de los Estados Unidos como la de este Tribunal.

cerciorarse si el coacusado Colón Vega se encontraba en la misma; la observación de conducta delictiva "a plena vista", desde un sitio donde legalmente tenía derecho a estar, que incidentalmente éste hiciera a través de la ventana entreabierta de dicha residencia, y su acción —producto de la observación realizada y de la probabilidad de que la evidencia delictiva fuera destruida— de forzar la entrada a dicha residencia, *no* es una violativa de las disposiciones pertinentes de nuestra Constitución ni de la Constitución de los Estados Unidos.

Mucho más errónea y peligrosa para la ciudadanía de este País resulta ser la posición sugerida —obtención de orden de allanamiento— en la opinión mayoritaria emitida, la cual *debilita peligrosamente* el concepto de "causa probable" contenido en la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, ante; concepto que, en el pasado, este Tribunal ha tenido el cuidado de fortalecer en beneficio de esa ciudadanía.

En resumen, la opinión del Tribunal emitida es una *verdaderamente* lamentable y errónea. En primer lugar, aun cuando parece estar escrita con el propósito de fortalecer los derechos civiles que le garantiza la Constitución a nuestra ciudadanía, *realmente tiene el efecto contrario.* Por otro lado, y al intentar cubrirse con un "manto de liberalidad", la mayoría del Tribunal erróneamente ordena la supresión de la evidencia delictiva ocupada en cuanto a la peticionaria Rivera Colón. Al así actuar, la mayoría pierde de vista que no se trata de ser "liberal" por el mero hecho o placer de serlo. De lo que *verdaderamente* se trata es de *resolver correctamente* los asuntos de índole penal que llegan ante la consideración de este Tribunal. *Nunca debemos olvidar que si bien es cierto que nuestro ordenamiento jurídico le concede unos derechos a los imputados de delito, los cuales tenemos la obligación de garantizarle a éstos, la sociedad en general tiene el derecho a que las personas culpables de violar las leyes penales sean debidamente responsabilizadas.*

Por las razones antes expresadas, *confirmaríamos* la resolución del tribunal de instancia declarando *sin lugar* la solicitud de supresión de evidencia presentada por la peticionaria Daisy Rivera Colón en el presente caso.