Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Peticionario<br><br>V.<br><br>HIRAM YERIEL CONCEPCIÓN MÉNDEZ<br><br>Recurrido<br><br><br><br>**EL PUEBLO DE PUERTO RICO**<br><br>Peticionario<br><br>V.<br><br>RAÚL EMANUEL BONILLA RODRÍGUEZ<br><br>Recurrido | TA2025CE00768<br><br><br><br><br><br>Consolidado<br><br><br><br><br><br>TA2025CE00770 | Certiorari procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm. C SC2025G0192 Sobre: Ley de Sustancias Controladas – Delitos de Fabricación, Distribución, Transportación, Ocultación, Dispensación y Posesión de Sustancias Controladas., Posesión de Armas de Fuego Sin Licencia., Portación, Posesión o Uso Ilegal de Armas Largas Semiautomáticas, automáticas o Escopeta de Cañón Cortado., Número de Serie o Nombre de Dueño en Arma de Fuego; Remoción O mutilación. a Sabiendas Compre, Venda, Reciba, Enajene, Traspase, Porte o Tenga en Su Posesión, Cualquier Arma de Fuego a la Cual Se Le Haya Removido, Mutilado, cubierto Permanentemente |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Jueza Lotti Rodríguez

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de diciembre de 2025.

Comparece El Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General de Puerto Rico (El Pueblo o peticionario) mediante recurso de *Certiorari* y *Auxilio de Jurisdicción* presentado el

14 de noviembre de 2025, en el cual nos solicita que dejemos sin efecto la *Resolución* emitida por el Tribunal de Primera Instancia, Sala de Arecibo (TPI o foro primario) el 9 de septiembre de 2025. Mediante el referido dictamen, el foro primario suprimió una pistola cargada con catorce municiones, un rifle, tres envases con marihuana, veintinueve envolturas con heroína, y cincuenta y seis bolsitas con cocaína que se ocuparon mientras se diligenciaban unas ordenes de arresto contra unos prófugos. El mismo día, el Procurador presentó otro recurso de *Certiorari* y *Auxilio de Jurisdicción,* esta vez, contra Hiram Yeriel Concepción que fue acusado por un núcleo de hechos en común y cuya vista de supresión se llevó a cabo de manera conjunta con la de Raúl E. Bonilla Rodríguez.

El 17 de noviembre de 2025, los recurridos presentaron su oposición al recurso y *Urgente Solicitud en Auxilio de Jurisdicción.*

Analizadas las dos posiciones, ese mismo día emitimos una *Resolución* en la cual ordenamos la paralización de los procedimientos de los recursos ante el Tribunal de Primera Instancia (TPI), hasta que dispusiéramos lo contrario. Además, ordenamos la consolidación de los referidos recursos.

Por los fundamentos que expondremos a continuación, expedimos el auto de *Certiorari* y revocamos las resoluciones recurridas. Así pues, levantamos la paralización de los procesos ante en el TPI.

## I.

Por hechos ocurridos el 13 de marzo de 2025, el Ministerio Público presentó unas denuncias contra Hiram Yeriel Concepción Méndez (señor Concepción Méndez) y Raúl E. Bonilla Rodríguez (señor Bonilla Rodríguez) (en conjunto, recurridos) por posesión de armas de fuego sin licencia, posesión y uso ilegal de arma larga semiautomática, posesión de un arma de fuego el cual se le removió, mutiló y cubrió permanentemente el número de serie, en violación a los Artículos 6.08,

6.09 y 3.12 de la Ley Núm. 168-2019, *Ley de Armas de Puerto Rico*, 25 LPRA secs. 466g, 466h y 466k; y tres (3) denuncias por posesión con intención de distribuir las sustancias conocidas como marihuana, heroína y cocaína, infringiendo el Artículo 401 de la Ley Núm. 4 de 23 de junio de 1979, Ley de Sustancias Controladas de Puerto Rico, 24 LPRA sec. 2401.[1] Todos los cargos fueron formulados en común y mutuo acuerdo entre los recurridos. El 14 de marzo de 2025, el Hon. Rafael I. Lugo Morales determinó causa por los seis delitos imputados.

Así las cosas, el 12 de mayo de 2025, se celebró la Vista Preliminar, y el TPI encontró causa para juicio por los seis (6) delitos imputados. Consecuentemente, el 22 de mayo de 2025, el Ministerio Público presentó seis (6) acusaciones contra los recurridos.[2] Posteriormente, los recurridos presentaron unas *Moción Solicitando Supresión de Evidencia.*[3] En esencia, estos indicaron que de la declaración jurada del agente González Álvarez se desprendía que, mientras estaban corroborando una orden de arresto contra un prófugo en un apartamento, un individuo no identificado salió del mismo y dejó la puerta abierta. Según los recurridos, el agente se asomó por la puerta y observó material delictivo, entrando luego al apartamento sin orden de registro ni allanamiento para ocupar la evidencia. Argumentaron que, dicha actuación fue contraria a derecho, pues violentó sus derechos constitucionales bajo la Cuarta Enmienda de la Constitución de Estados Unidos. Además, cuestionaron la credibilidad del testimonio del agente, calificándolo de insuficiente, estereotipado e inverosímil, limitado a justificar la intervención estatal. Asimismo, sostuvieron que no existían motivos fundados para la intervención, por lo que el arresto resultaba ilegal. Finalmente, plantearon que el registro y arresto se presumen inválidos, por lo cual le correspondía al Ministerio Público

---

[1] Entrada #3 del Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI) en los casos TA2025CE00768 y TA2025CE00770.
[2] Entrada #1 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.
[3] Entrada #7 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.

demostrar su legalidad, y solicitó la supresión de la evidencia por ser producto de una intervención presuntamente ilegal.

Por su parte, el Ministerio Público presentó una *Moción en Oposición a Supresión de Evidencia.*[4] En síntesis, El Pueblo sostuvo que, conforme al testimonio del agente González Álvarez, la intervención en el Residencial Vivamery en Manatí fue producto del diligenciamiento de órdenes de arresto contra dos (2) individuos prófugos: Michael Lociam Bracero Reyes, conocido como "La L", y Ángel M. Cosme Perosa. Durante el operativo, el agente observó a un individuo salir del Apartamento 804, quien, al notar su presencia, salió corriendo y dejó la puerta del apartamento abierta. Además, sostuvo que, según el testimonio del agente, este llegó hasta la puerta del Apartamento 804, lugar al que se dirigieron para corroborar información relacionada con las órdenes de arresto contra los dos (2) prófugos. Desde el exterior, logró observar una mesa en la sala sobre la cual se encontraban armas de fuego y sustancias controladas. Asimismo, indicó que divisó a un individuo en la sala, vestido con pantalón negro con líneas blancas y sin camisa, quien al notar su presencia salió corriendo hacia uno de los dormitorios.

Así pues, el agente declaró que los oficiales se identificaron, ingresaron al dormitorio y procedieron con el arresto del individuo que había corrido hacia el dormitorio —el señor Concepción Méndez— y de otro sujeto que se encontraba en el dormitorio, identificado como el señor Bonilla Rodríguez. Ambos manifestaron no poseer licencia para portar armas, por lo que se les realizaron las advertencias legales correspondientes. Finalmente, señaló que en el Apartamento 106 se logró el arresto de uno de los prófugos, el señor Michael L. Bracero Reyes. El Ministerio Público señaló que, en la vista preliminar, el recurrido se limitó a presentar planteamientos en reconsideración y no

---

[4] Entrada #8 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.

impugnó el testimonio del agente González Álvarez. Además, El Pueblo sostuvo que la Constitución de Puerto Rico no es óbice para todo registro efectuado sino solo para aquellos que sean irrazonables. *Pueblo v. Ferreira Morales*, 147 DPR 238 (1998). Consecuentemente, expresó que un lugar u objeto gozarán de protección constitucional dependiendo de la naturaleza de la intrusión gubernamental, su efecto sobre la expectativa de intimidad y la necesidad y utilidad del método utilizado para implantar la ley. *Pueblo v. Rivera Colón*, 128 DPR 672 (1991).

De igual modo, sostuvo que corresponde realizar un balance entre la expectativa de intimidad y los intereses públicos que hayan motivado la actuación estatal. Pueblo v. López Colón, 200 DPR 273 (2018). Asimismo, adujo que cuando el Estado hace una incautación sin previa orden judicial, puede demostrar la validez de la intervención mediante la aplicación de una norma de excepción como la evidencia a plena vista. *Pueblo v. Rivera Colón,* 128 DPR 672, (1991). Por todo lo cual, El Pueblo indicó que no procedía la solicitud de supresión al amparo de la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, por lo cual debía denegarse.

Así las cosas, el 9 de septiembre de 2025 se celebró la vista de supresión de evidencia.[5] Durante la vista, El Pueblo presentó como prueba el testimonio del agente González Álvarez. De igual forma, se marcaron como *Exhibits* del Ministerio Público los siguientes documentos:

1. Prueba de Campo en relación a las sustancias controladas, marihuana, heroína y cocaína.
2. La PPR636.1, inventario de propiedad ocupada
3. La PPR876, dos pruebas de funcionamiento, una para el rifle y otra para la pistola.
4. Dos consultas de ciudadano correspondiente una al recurrido y otra al señor Concepción Méndez en relación a que ninguno tiene licencia de armas para portar armas de fuego.

---

[5] Véase, Anejo 9 de la Petición de Certiorari, Regrabación de la Vista de Supresión de Evidencia celebrada el 9 de septiembre de 2025.

Por su parte, la defensa presentó el testimonio de la señora Pérez Pagán. De igual forma, se marcó como *Exhibit* de la defensa el siguiente documento:

1. Solicitud de Servicio

En cuanto la prueba testifical del Ministerio Público:

**1. Testimonio del agente González Álvarez**

El agente González Álvarez declaró que lleva treinta y cuatro años laborando en la Policía de Puerto Rico y que, al presente, se encuentra adscrito a la división de Inteligencia en el municipio de Arecibo.[6] Una vez estipulada su capacidad, expresó que el 13 de marzo de 2025, en horas de la mañana, sostuvo una reunión con el Sgto. Castillo ("Sargento Castillo"), el grupo de arresto y el de inteligencia para llevar a cabo una operación de corroboración en el Residencial Vivamery, para diligenciar dos órdenes de arresto contra dos prófugos.[7] Señaló que, durante la reunión, se le asignó la intervención en el Apartamento 804 del Edificio 8 del Residencial Vivamery.[8] Agregó que, se dividieron en dos grupos, el primero para el apartamento 804 y el segundo para el edificio 1, apartamento 106.[9] Manifestó que tenían como objetivo buscar dos prófugos, Michael Lociam conocido como "la L" y el otro con nombre de Ángel.[10]

Entonces, relató que ese día, tras recibir las instrucciones correspondientes, se dirigieron al Residencial Vivamery, al cual llegaron alrededor de las seis de la mañana.[11] Expresó que él era el puntero, por lo cual estaba en el primer vehículo que iba para el Edificio 8.[12] Testificó que se estacionaron en la parte posterior del Edificio 8, se bajaron del vehículo, y él fue el primero en avanzar, caminó por la parte posterior

---

[6] Íd., Min. 04:37 – Min. 05:11.
[7] Íd., Min. 05:11 – Min. 05:58.
[8] Íd., Min. 06:42 – Min. 06:50.
[9] Íd., Min. 06:53 – Min. 07:10.
[10] Íd., Min. 08:35 – Min. 09:00.
[11] Íd., Min. 09:16 – Min. 09:24.
[12] Íd., Min. 09:28 – Min. 09:33.

del Edificio 8, pegado de la pared.[13] Manifestó que, al aproximarse a la escalera del edificio, observó que un individuo sin camisa y con tatuajes salía del Apartamento 804.[14] Señaló que el Apartamento 804 se encontraba en el primer nivel del edificio y que, al aproximarse a la escalera, el individuo sin camisa salió corriendo al notar la presencia de la policía.[15] No obstante, indicó que no observó que el individuo llevara algo delictivo, además que su objetivo era el apartamento.[16] Añadió que el individuo dejó la puerta del apartamento abierta al salir corriendo.[17] Precisó que, al momento del incidente, se encontraba a una distancia aproximada de doce (12) a catorce (14) pies del sujeto.[18] En cuanto a la estructura del edificio, explicó que no estaba completamente cerrado, ya que la parte posterior permanecía abierta, permitiendo visibilidad hacia las escaleras, las cuales brindan acceso libre a los cuatro apartamentos ubicados en el primer piso.[19]

Entonces, relató que, tras observar al individuo correr, notó que dejó la puerta del apartamento abierta, lo que le permitió observar que había una mesa redonda en la sala sobre la cual había un rifle, una pistola y sustancias controladas.[20] Testificó que inmediatamente salió corriendo una persona desde la sala, a quien identificó como el señor Concepción Méndez.[21] Describió que el señor Concepción Méndez vestía un pantalón deportivo negro con líneas blancas y no llevaba camisa, y que, al verlo, salió corriendo e ingresó a uno de los dormitorios del apartamento.[22] Atestiguó que, en ese momento, se encontraba acompañado por el sargento Castillo y el agente Curbelo, a quien le ordenó que custodiara las armas observadas en la sala, mientras él y el sargento Castillo ingresaron al dormitorio y procedieron con el

---

[13] Íd., Min. 09:33 – Min. 09:48
[14] Íd., Min. 09:49 – Min. 09:58.
[15] Íd., Min. 10:26 – Min. 10:45.
[16] Íd.
[17] Íd., Min. 10:46 – Min. 10:51.
[18] Íd., Min. 10:51 – Min. 11:01.
[19] Íd., Min. 10:06 – Min. 10:21.
[20] Íd., Min. 11:05 – Min. 11:15.
[21] Íd., Min. 11:16 – Min. 11:41.
[22] Íd., Min. 11:41 – Min. 11:49.

arresto del señor Concepción Méndez.[23] Añadió que en dicho dormitorio también se encontraba el señor Bonilla Rodríguez, a quien identificó en sala.[24]

Indicó que, tras haber observado armas de fuego, se les preguntó a ambos si poseían licencia de armas y si residían en el apartamento, a lo que respondieron negativamente, además se le hicieron las advertencias de ley.[25] Luego de efectuar los arrestos en el dormitorio, el agente testificó que trasladó a los individuos a la sala del apartamento.[26] Indicó que sobre la mesa se encontraba un rifle AR-15 calibre .223 de color negro, con la serie mutilada.

Indicó que, tras haber observado armas de fuego, se les preguntó a ambos si poseían licencia de armas y si residían en el apartamento, a lo que respondieron negativamente, además se le hicieron las advertencias de ley. Luego de efectuar los arrestos en el dormitorio, el agente testificó que trasladó a los individuos a la sala del apartamento.[27] Indicó que sobre la mesa se encontraba un rifle AR-15 calibre .223 de color negro, con la serie mutilada y cargado con municiones del mismo calibre.[28] Además, observó otro cargador para rifle .223, una pistola P365 de color negro con su respectivo cargador y municiones, cincuenta y seis bolsas de cocaína, veintinueve bolsas de heroína, tres envases con marihuana y una suma de cincuenta y nueve dólares en efectivo.[29]

Señaló que se encontraba en la búsqueda de Michael Lociam, quien figuraba como prófugo, y que tenía conocimiento de que frecuentaba los apartamentos 804 y 106.[30] Destacó que el Apartamento 804 pertenecía a una mujer, pero que al momento de la intervención

---

[23] Íd., Min. 11:50 – Min. 12:03.
[24] Íd., Min. 12:03 – Min. 12:21.
[25] Íd., Min. 14:33 – Min. 14:55.
[26] Íd., Min. 15:21 – Min. 16:15.
[27] Íd.
[28] Íd.
[29] Íd.
[30] Íd., Min. 12:50 – Min. 13:31.

no se encontraba ninguna fémina en el lugar. Por otro lado, añadió que en el Apartamento 106 del Edificio 1 arrestaron a Michael Lociam.[31]

Más adelante, manifestó que tardó "como un minuto" desde que se bajó del vehículo hasta que vio al individuo que salió corriendo, así como a las otras personas dentro del apartamento.[32] Atestiguó que, tras efectuar el arresto del recurrido y del señor Concepción Méndez, los trasladó junto con la evidencia ocupada a la División de Drogas de Arecibo, donde el agente Luis López realizó pruebas de campo a las sustancias incautadas, arrojando resultados positivos a cocaína, marihuana y heroína.[33] Por último, afirmó que su supervisor hizo gestiones con el Departamento de Vivienda Federal, obteniendo información que confirmaba que el Apartamento 804 pertenecía a la referida señora.[34]

De otro lado, en el contrainterrogatorio, manifestó que fue su supervisor quien realizó las gestiones con el Departamento de Vivienda Federal para conocer a quien le pertenecía el apartamento, y que dicha gestión, hasta donde sabe, se hizo el mismo día, después del operativo. Añadió que, desconoce tanto la identidad de la persona contactada como la hora exacta en que se efectuó la comunicación. Precisó que fue el sargento Castillo quien se comunicó con el Departamento de Vivienda Federal y quien le proveyó la información antes del mediodía.[35] Asimismo, afirmó que la evidencia la vio a plena vista.[36] Adujo que, al intervenir con los acusados, les preguntó si poseían licencia para portar armas.[37]

Además, indicó que arrestaron a los acusados y se le hicieron las advertencias, negó haberle hecho las preguntas antes de las

---

[31] Íd., Min. 14:04 – Min. 14:18 ; Min. 19:16 – Min. 19:19.
[32] Íd., Min. 18:20 – Min. 18:25.
[33] Íd. Min. 18:33 – Min. 19:03.
[34] Íd., Min. 19:34 – Min. 20:04.
[35] Íd., Min. 25:12 – Min. 25:42.
[36] Íd., Min. 25:55 – Min. 25:58.
[37] Íd., Min. 26:00 – Min. 26:16.

advertencias.[38] Relató que fungió como puntero durante la intervención, **en la cual participaron más de cinco vehículos oficiales y entre diez (10) a quince (15) agentes.**[39] Indicó que lo acompañaban varios compañeros, entre ellos el agente Curbelo, el sargento Castillo y el grupo de arrestos, quienes se encontraban detrás de él, aunque no pudo precisar la distancia exacta, pero afirmó que estaban cerca. En cuanto a la ubicación del Apartamento 804, explicó que se encuentra a mano derecha de las escaleras abiertas del edificio, y que al momento en que el individuo salió corriendo del apartamento en dirección opuesta, él se hallaba aproximadamente a una distancia de diez (10) a doce (12) pies.

Expresó que vio al individuo por segundos, aproximadamente cuatro segundos, y que no puedo identificar de qué eran los tatuajes. Declaró que el individuo salió del Apartamento 804, sin ser seguido por otra persona, y que fue quien dejó la puerta del apartamento abierta.[40] Aclaró que no pudo precisar si el individuo abrió la puerta o si está ya se encontraba abierta, sino que la puerta estaba abierta al momento en que el sujeto salió. Especificó que la puerta abre hacia adentro.[41] Además, indicó que el individuo lo miró antes de salir corriendo, describiéndolo como un hombre joven, perfilado y que lo que más llamó su atención fueron los tatuajes, sin haber notado el color de sus ojos.[42]

Por último, indicó que la puerta del apartamento no estaba rota, pero el marco sí lo estaba.[43] Sostuvo que no verificó si la puerta abría y cerraba, pero que al ingresar al apartamento vio que el marco de puerta estaba roto. Adujo que tanto el sargento Castillo como el agente Curbelo entraron al apartamento, y que desde que se bajó del vehículo hasta que realizó los arresto pasó aproximadamente un minuto. Afirmó

---

[38] Íd., Min. 26:17 – Min. 26:46.
[39] Íd., Min. 27:24 – Min. 28:01.
[40] Íd., Min. 34:32 – Min. 35:24.
[41] Íd., Min. 36:20 – Min. 36:22.
[42] Íd., Min. 36:36 – Min. 37:32.
[43] Íd., Min. 37:45 – Min. 37:55.

que los otros agentes estaban en el área del apartamento.[44] Finalmente, afirmó que no pasó por desapercibido el individuo que salió corriendo.[45] En cuanto la prueba testifical de la defensa:

### 1. Testimonio de la señora Pérez Pagán:

Inició su testimonio identificándose como Glenda Pérez Pagán, empleada del Residencial Vivamery desde hace dos años.[46] Expresó que el 13 de marzo de 2025, se llevó a cabo una intervención policial en el complejo, y que, por razones de seguridad, su equipo de trabajo permaneció en la oficina durante el operativo.[47] Tan pronto terminó la intervención, los empleados pasaron por las unidades para hacer las solicitudes de servicios y los residentes notificaron lo sucedido, y se hicieron las reparaciones de puertas y cerraduras.[48] Explicó que, como parte de ese proceso, se realizaron reparaciones en cinco apartamentos, incluyendo los números 804, 106 y 511, aunque no recordaba los restantes.[49] Detalló que las reparaciones incluyeron marcos de puertas, cerraduras y puertas completas, las cuales resultaron dañadas por la intervención policial. Aclaró que no se habían recibido reportes de puertas rotas el día anterior, y que las solicitudes se hicieron después de la intervención. Asimismo, indicó que la solicitud de servicio la preparó el asistente administrativo. Finalmente, declaró que fue personalmente a verificar los apartamentos y después de la Solicitud de Servicio confirmó que el trabajo se hubiera realizado.[50]

En el contrainterrogatorio, mencionó que la Solicitud de Servicio no fue a solicitud de un residente, sino que se trata de una orden general tras la intervención de la policía, con el fin de dar de baja el material.[51] Afirmó que en el Apartamento 804 vive la Sra. Kiomara, y

---

[44] Íd., Min. 38:50 – Min. 39:20.
[45] Íd., Min. 40:07 – Min. 41:22.
[46] Íd., Min. 43:22 – Min. 43:36.
[47] Íd., Min. 44:02 – Min. 44:41.
[48] Íd.
[49] Íd., Min. 44:50 – Min. 45:21.
[50] Íd., Min. 53:22 – Min. 53:41.
[51] Íd., Min. 54:51 – Min. 55:05.

que ella no fue quien hizo la petición.[52] Subsiguientemente, expresó que la Sra. Kiomara fue quien validó el trabajo que realizaron en el apartamento y quien permitió el acceso para realizar la reparación de la puerta y el marco.[53] Añadió que la Sra. Kiomara le dio acceso el mismo día de los hechos antes de las cinco de la tarde y le indicó que los daños fueron ocasionados por la intervención de la policía. Además, declaró que no recordaba si la Sra. Kiomara le dijo si estuvo presente en el momento de la intervención.[54] Asimismo, mencionó que el día antes de la intervención no se verificó el Apartamento 804 y que antes no se había reportado ninguna deficiencia. Por último, indicó que observó los daños antes de las reparaciones, pero que no recordaba con exactitud cuáles eran las deficiencias del Apartamento 804.[55]

Culminados los testimonios, el foro primario concluyó que procedía la supresión de evidencia solicitada por los recurridos. En consecuencia, el 9 de septiembre de 2025, el foro primario emitió *Resolución* en la cual declaró "Ha lugar" la supresión de evidencia solicitada por los recurridos.[56]

En desacuerdo, el Ministerio Público presentó *Moción Solicitando Reconsideración.*[57] En resumen, El Pueblo sostuvo que los recurridos no demostraron tener legitimación activa para alegar una expectativa razonable de privacidad respecto a la evidencia ocupada. Argumentó que, los recurridos no eran dueños ni vivían en el apartamento objeto del registro donde se ocupó la evidencia delictiva, por lo que no le asistía la defensa de registro y allanamientos irrazonables por no haber una orden. En concordancia, expresó que previo a reconocer el derecho a la intimidad y aplicar el escrutinio estricto, se debe examinar si existe una expectativa razonable de intimidad y si las acciones de la persona

---

[52] Íd., Min. 55:06 – Min. 55:05.
[53] Íd., Min. 55:21 – Min. 55:55.
[54] Íd., Min. 57:03 – Min. 57:15.
[55] Íd., Min. 58:08 – Min. 59:00.
[56] Entrada #2 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.
[57] Entrada #4 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.

afectada demuestran inequívocamente la intención de albergar esa expectativa.

En respuesta, los recurridos presentaron *Moción en Oposición a Solicitud de Reconsideración.*[58] Los recurridos reiteraron que el testimonio del agente González Álvarez fue inverosímil para justificar el registro y los arrestos. Argumentaron que la condición del testimonio estereotipado nunca fue rebatida por el Ministerio Público. Respecto a la falta de expectativa de intimidad, sostiene que El Pueblo no presentó prueba sobre la falta de autorización, legitimidad u otro derecho para estar en el apartamento intervenido. Por último, expresaron que la única evidencia creíble es que la policía "tumbó la puerta" del Apartamento 804 y ocupó evidencia delictiva. Por ende, solicitaron al TPI que denegara la reconsideración presentada por el Ministerio Público.

Posteriormente, mediante una *Resolución* emitida el 31 de octubre de 2025 y notificada el 3 de noviembre de 2025, el foro primario denegó la reconsideración presentada.[59] Inconforme con el proceder del foro primario, el 14 de noviembre de 2025, El Pueblo acudió ante este Tribunal mediante recurso de *Certiorari* y *Auxilio de Jurisdicción,* en el cual señala los siguientes errores:

> El Tribunal de Primera Instancia erró al suprimir las armas y sustancias controladas ocupadas, a pesar de que el señor Concepción Méndez no demostró que tenía legitimación activa, por lo cual no se activó la protección contra los registros y allanamientos irrazonables.
>
> En la alternativa, el Tribunal de Primera Instancia erró al suprimir las armas y sustancias controladas ocupadas, a pesar de que se configuró la excepción de evidencia a plena vista, lo cual hacía innecesaria un orden judicial previo al registro.

**II.**

El Tribunal de Apelaciones conocerá mediante auto de certiorari expedido a su discreción, de cualquier resolución u orden

---

[58] Entrada #10 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.
[59] Entrada #5 de SUMAC TPI en los casos TA2025CE00768 y TA2025CE00770.

dictada por el Tribunal de Primera Instancia. 4 LPRA sec. 24y (b). El certiorari es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar, a su discreción, una decisión de un tribunal inferior. 32 LPRA sec. 3491; *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020); *Pueblo v. Díaz De León*, 176 DPR 913, 917 (2009). Es decir, contrario al recurso de apelación, el tribunal superior puede expedir el auto de certiorari de manera discrecional. *Pueblo v. Rivera Montalvo*, supra. Ahora bien, la discreción no es irrestricta. El ejercicio discrecional no puede hacerse en abstracción del Derecho. *Pueblo v. Ortega Santiago*, 125 DPR 203, 214 (1990).

La Regla 40 del Reglamento del Tribunal de Apelaciones dirige nuestra decisión al expedir un recurso de certiorari en el ámbito penal. La misma nos invita a expedir el mismo, sujeto a sus criterios:

> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B.

### III.

Tanto el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, como la Cuarta Enmienda de la Constitución de Estados Unidos, protegen a nuestros habitantes contra registros y allanamientos irrazonables de su persona,

pertenencias y propiedad realizados por funcionarios del Estado. *Pueblo v. Bonilla*, 149 DPR 318, 328 (1999). En específico la Carta de Derechos de la Constitución de Puerto Rico en su artículo II, sección 10 dispone:

> **No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.**
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar o registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> **Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. (Énfasis nuestro).**

El propósito de esta protección tan trascendental en la vida de todo ciudadano es proteger el ámbito de intimidad y dignidad del ser humano frente a actuaciones arbitrarias del Estado. *Pueblo v. Apolinar Rondón*, 2025 TSPR 113 (20225). Cabe señalar que tanto el contenido como la intención es análoga a la protección constitucional de la Enmienda Cuarta de la Constitución de Estados Unidos.[60] Id.

Tan reciente como el pasado mes de noviembre del año en curso el Tribunal Supremo de Puerto Rico resolvió el caso de *Pueblo v. Apolinar Rondón*, 2025 TSPR 113.  La importancia de lo resuelto estriba en una controversia fundamental sobre la protección constitucional contra registros y allanamientos irrazonables. El TSPR reiteró que el alcance de la protección contra registros y allanamientos irrazonables dependerá de si la persona afectada alberga una expectativa razonable de intimidad. Véase, además, Pueblo v. Soto Soto, 168 DPR 46, 55 (2006). A tales efectos reitero sus pronunciamientos en *Pueblo v. Díaz, Bonano,* 176 DPR 601, 613 (2009) en donde expreso que:

> La determinación de la existencia de una expectativa razonable de intimidad que active la protección de la cláusula

---

[60] Emda. IV, Const. EE. UU., LPRA, Tomo 1, pág. 187.

constitucional es una cuestión de umbral que debe determinarse antes de considerar si la intervención gubernamental fue razonable. Una vez se determina la configuración de un registro por parte del Estado, entonces el siguiente peldaño consiste en realizar un balance de intereses entre esa expectativa y los intereses estatales que hayan motivado la actuación estatal. Véase, además, *Pueblo v. Yip Berrios*, 142 DPR 386, (1997).

Se entiende que ha ocurrido un registro cuando se infringe la expectativa de intimidad que la sociedad está preparada a reconocer como razonable. *Pueblo en interés menor N.O.R.*, 136 DPR 949, págs. 961-962 (1994). La cuestión central es si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete. *ELA v PR Tel. Co.*, 114 DPR 394, 402 (1983); *Pueblo v. Lebrón*, 108 DPR 324, 331 (1979).

Ahora bien, la protección constitucional se activa si quien la invoca puede reclamar una *expectativa de intimidad* en oposición a la acción gubernamental. *Pueblo v. Apolinar Rondón, supra.*

En un origen la protección constitucional se interpretaba en el sentido de proteger la intrusión física con los lugares especificados en la cláusula constitucional, personas, casas, papeles y efectos o pertenencias. En aquel entonces era vital la penetración física en algunos de los lugares o cosas protegidas.[61] Eventualmente, el derecho evoluciono al igual que la sociedad para proteger las personas, no los lugares o sus cosas. Dicha evolución fue marcada por el caso de la Corte Suprema de los Estados Unidos, *Katz v. United States*, 389 US 347 (1967), el cual estableció el estándar de "expectativa razonable de intimidad." Nuestro máximo foro federal se debatía en si la cabina telefónica cuya comunicación se había escuchado por el gobierno era o no un lugar constitucional protegido. El Tribunal Supremo de Estados

---

[61] E.I. Chiesa Aponte, *Procedimiento Criminal y la Constitución: etapa investigativa*, San Juan, Ediciones SITUM, 2017, pág. 238.

Unidos aclaró en cuanto a la fijación de delimitar la protección a un lugar lo siguiente:

> But this effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case.[9] For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. ... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. ....[62]

Así sin ambages declaro que el alcance de la Cuarta Enmienda protege personas no lugares y, por tanto, no puede depender de la presencia o ausencia de una intrusión física en determinado lugar.[63] En la antedicha opinión el Juez Harlan hizo una opinión concurrente en la cual articula lo que ha venido a ser el criterio rector para auscultar si se activa la protección constitucional, esto es la "expectativa razonable de intimidad" por parte de quien invoca la protección.

En su opinión concurrente el Juez Harlan explicó que para determinar si la acción del gobierno constituía una búsqueda o registro sujeta a la cuarta enmienda había que examinar dos cosas: primera que la persona haya mostrado una expectativa real (subjetiva) de privacidad y segundo, que la expectativa sea una que la sociedad está dispuesta a reconocer como aceptable.[64]

Chiesa Aponte explica que no se trata, no basta, con que la persona tenga una expectativa razonable de intimidad; requiere, además, sobre todo, que la expectativa sea una razonable, esto es socialmente legitima.[65] Para ilustrar lo que se entiende por una expectativa razonable o socialmente legitima, Chiesa Aponte nos dirige a *California v. Geenwood*, 486 US 35 (1988). En este caso los agentes

---

[62] Katz, 351.
[63] Id, 353.
[64] Id, 361.
[65] Chiesa Aponte, supra, pág. 241.

del orden público se apoderaron de unas bolsas de basura dejadas afuera de la casa del acusado para ser recogidas por los trabadores de desperdicios sólidos. Dentro de las bolsas los agentes encontraron material que les permitió obtener una orden de registro lo que condujo a la incautación de sustancias controladas. El Tribunal Supremo de Estados Unidos entendió que no se violó la Enmienda Cuarta pues el acusado no podía invocar una expectativa razonable de intimidad en unas bolsas que dejo en la acera para su recogido. Aunque el acusado albergara una expectativa de intimidad al meter el material en bolsas no se podía considerar razonable o socialmente legitima por estar ausente el elemento objetivo de que la sociedad reconociera como razonable esa expectativa.[66]

Es la persona que argumenta tener la expectativa de intimidad quien como cuestión de umbral ha de probar que tiene una expectativa legitima y razonable. Así, expresa el Tribunal Supremo de Puerto Rico, citando a Chiesa Aponte que, el criterio de expectativa razonable a la intimidad es igualmente controlante, tanto en relación a si se activa la protección constitucional como en relación al grado de dicha protección[67]Corresponde al agraviado demostrar que se encontraba legalmente en el lugar registrado o allanado. *Acarón et al. v. D.R.N.A.*, 186 DPR 564, 578 (2012).

Determinar si una persona goza de expectativa de intimidad implica, primeramente, que haya exhibido una expectativa subjetiva de intimidad. *Pueblo v. Apolinar Rondón; supra.* No se trata de una simple reserva mental, sino de una conducta de actos afirmativos que demuestren, inequívocamente, la intención de alojar dicha expectativa. *Pueblo v. Apolinar Rondón, supra; Pueblo v. Ortiz Rodríguez*, 147 DPR

---

[66] Id. 241.

[67] Pueblo v. Apolinar Rondon citando a E. L. Chiesa Aponte, *Procedimiento criminal y la Constitución: etapa investigativa*, San Juan, Ed. SITUM, 2017, pág. 244. Véase, también: E. L. Chiesa Aponte, *Los Derechos de los acusados y la factura más ancha*, 65 Rev. Jur. UPR 83, 136 (1996)

433, 442 (1999). Dos de los criterios para evaluar si alguien posee una expectativa razonable de intimidad sobre una propiedad particular es determinar si esta persona tiene acceso legítimo a la propiedad y si puede excluir a los demás de su uso. *Acarón et al. v. D.R.N.A.*, supra, pág. 578.

Una vez se identifica una expectativa individual de intimidad, se pasará a una segunda etapa en la que se evaluará si dicha expectativa es reconocida como razonable por la sociedad. *Pueblo v. Apolinar Rondón, supra; Weber Carrillo v. ELA et al.*, 190 DPR 688, 702 (2014).

**IV**

En el caso que nos ocupa no se activó la protección constitucional del Articulo II, sección 10 de la Constitución de PR. A partir de *Katz v. United States,* supra, la intromisión en el lugar protegido ya no es el criterio rector, sino, la expectativa razonable de intimidad. Y en el caso ante nuestra consideración los recurridos nunca expusieron aseveración alguna que pudiera interpretarse como un reclamo de expectativa razonable de intimidad.

Recordemos que el criterio rector es si la persona tiene un derecho a albergar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete. *Katz v. United States,* supra; *E.L.A. v. P.R. Tel. Co*, supra, pág. 402.

Hay una ausencia total de tan siquiera una mención que le conceda a los acusados la expectativa de intimidad sobre el apartamento que estaba a nombre de un tercero y del cual no se presentó alegación alguna si los acusados estaban en calidad de invitados, dueños, grupo familiar o cualquier otra razón que haya dado legitimidad a su estadía en dicho lugar.

En una moción de supresión de evidencia no basta con alegar doctrinas, hay que incluir hechos que sostengan las doctrinas, en

particular la legitimación activa del agraviado. Aquí los acusados expusieron que la ocupación de presunto material delictivo y arresto fue sin orden de allanamiento o de arresto; que el testimonio del agente fue un testimonio trillado y estereotipado para justificar una intervención y de evidencia ocupada sin motivos fundados y carentes de credibilidad; que dicha forma fue un registro y arresto sin orden previa y carente de legalidad; que en nuestro ordenamiento jurídico todo registro que se lleve a cabo sin una orden judicial se presume irrazonable; una incautación sin orden judicial produce una presunción de invalidez que el Ministerio Fiscal viene obligado a refutar, con la carga establecida en la Regla 14 de Evidencia; que el arresto conforme a la Regla 11 de Procedimiento Criminal cuando se trata -como en este caso- de evidencia incautada sin previa orden judicial y habiéndose reseñado aquí hechos que reflejan la ilegalidad de tal arresto, el tribunal tiene que ordenar la celebración de una vista judicial para la discusión de la Moción de Supresión de Evidencia presentada por la Defensa. Además, alegaron que, en dicha vista, el Ministerio Público tiene el peso de refutar la presunción de ilegalidad de este registro y arresto realizado sin orden judicial previa. Repitiendo que el testimonio que dio lugar a la ocupación de la evidencia era uno estereotipado y falso, por lo que dicha evidencia debía ser suprimida pues su incautación era ilegal. Por último, invocaron los criterios de la regla 234 de Procedimiento Criminal. Podríamos resumir que los recurridos hacen un potpurrí de alegaciones, arresto invalido, registro ilegal, testimonio estereotipado y otros. Pero entre tanto, olvidaron incluir el criterio rector, la expectativa razonable de intimidad que albergaban en el lugar donde se ocupó una pistola cargada con catorce municiones, un rifle, tres envases con marihuana, veintinueve envolturas con heroína, y cincuenta y seis bolsitas con cocaína. Razón por la cual no activaron la protección constitucional que surge del Artículo II, sección 10 de la Constitución de Puerto Rico.

Por lo antes explicado erró el Tribunal de Primera Instancia al suprimir las armas y sustancias controladas ocupadas.

Por los fundamentos antes expuestos, se expide el auto de *Certiorari* y se revocan las resoluciones recurridas.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones